[No. G044556. Fourth Dist., Div. Three. Dec. 9, 2011.]

SARA HENRY, Plaintiff and Appellant, v.
RED HILL EVANGELICAL LUTHERAN CHURCH OF TUSTIN,
Defendant and Respondent.

## COUNSEL

HamptonHolley, George L. Hampton IV and Colin C. Holley for Plaintiff and Appellant.

Murchison & Cumming, Edmund G. Farrell III, Michael D. McEvoy and Maria A. Starn for Defendant and Respondent.

## OPINION

**MOORE, J.**—Plaintiff Sara Henry sued Red Hill Evangelical Lutheran Church of Tustin (sometimes the church) for wrongful termination under the California Fair Employment and Housing Act (Gov. Code,[1] § 12900 et seq.; the FEHA) and for wrongful termination in violation of public policy based upon her termination from the Red Hill Lutheran School (the school) for living with her boyfriend and raising their child together without being married. The trial was bifurcated with the church's defenses to be tried first to the court. The court held the ministerial exception applied and entered judgment in favor of the church. We affirm and hold (1) Henry's claim of wrongful termination under the FEHA is barred because the church does not qualify as an "employer" under the FEHA; (2) Henry's employment was terminated for religious reasons for which the church and school are exempt under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.; Title VII); and additionally, (3) her claim for wrongful termination in violation of public policy is barred by the ministerial exception.

I

FACTS

The Red Hill Evangelical Lutheran Church of Tustin was incorporated in California in 1957. It was formed for nonprofit religious purposes and is tax exempt. The school is part of the church's ministry and does not exist as a separate legal entity. The school is on church property and is adjacent to the church.

Henry was an at-will employee of the church. She taught preschool children at the school from August 2002, until her employment was terminated in May 2009. She started as a preschool teacher and became the director of the preschool in 2003. She continued teaching a preschool class in addition to her duties as director.

---

[1] All undesignated statutory references are to the Government Code.

The school had five preschool classes and an average attendance of 105 preschoolers a day. The preschoolers had to be at least three years old by September 1, and no older than five years and nine months. The school also had kindergarten through eighth grades.

Before each school year Henry was provided with a document setting forth the professional expectations for the teachers. She knew she was to serve as a Christian role model to the students and their parents, both in and out of school. Prior to the 2008–2009 school year, Henry and the school's principal, Cindy Jordan, signed a document entitled "Ministry Commitment." In that document Henry acknowledged she was an "at-will" employee. Other than in the title of the document, the word *ministry* is used three times in the document. "We recognize and affirm the ministry of teaching as a God-ordained vocation for you. We rejoice that God has brought you to us as a 'fellow-laborer' in this ministry." And on the second page: "We, at Red Hill Lutheran Church and School, pledge our prayer, support, and assistance to you as you minister to our students and families."

Henry knew the school was "Bible-based." Although teachers were not required to be Lutheran—Henry is Catholic—teachers were required to be practicing Christians "involved in a church-based setting on a regular basis." The parents of students did not have to be Lutherans, but they too had to be practicing Christians.

As director of the preschool, Henry made the classroom arrangements, helped hire teachers, and scheduled their hours and classroom assignments. She also processed the applications for incoming students and made sure the school complied with state mandates. Every week she gave a tour of the preschool to parents of prospective students. During the tour Henry talked to the parents about the "Christian-based, Bible-based values of the school." She wanted the parents to understand that if they sent their children to the school, they could expect their children to receive a "Christian education" and Bible-based "Christian values."

Every week the teachers participated in devotions. They read from a "devotional-type book," took prayer requests from the group, and prayed for each other.

As a teacher, Henry taught religion to the preschoolers as a part of the regular curriculum. She spoke to the children about Jesus on a daily basis. Two or three times a week she taught a Bible story in conjunction with the theme being taught that week. According to Henry, the Christian themes she introduced related to Christianity in general and "not specifically to Lutheran

doctrine or teachings." On occasion when the need to discipline a child arose, Henry would "bring in some theme from a Bible story or a teaching of Christianity."

Every Wednesday the preschool classes and their teachers attended chapel for about half an hour. Henry was in charge of the chapel service three to four times a school year. The responsibility of reading a Bible story or performing some other act of religious teaching during chapel rotated among the teachers. Henry led her class in prayer each day: at the beginning of each day, before each meal, and at the end of each day. Henry estimated she spent one hour a week teaching religion, another hour leading the children in prayer, and the remainder of the time she spent teaching—other than those times she was in charge of the chapel service—was spent on "secular subjects, including such things as: numbers and counting; the alphabet and letter concepts; basic science; small motor control; large motor control; social, emotional, physical and language skills; and computer skills."

Henry was married when she applied to the school for a teaching position. She subsequently divorced and in June 2007, gave birth to a child fathered by her boyfriend. While Henry was pregnant, she told representatives of the church that she intended to get married, but was not ready to do so just yet. She returned to the school for the 2007–2008 school year. Henry stated she knew the school would not punish her for having had a baby out of wedlock. She lived with her boyfriend prior to having the baby, but did not know whether the principal of the school was aware they were living together.

At the end of 2008 the principal, Jordan, overheard a group of parents talking about Henry and one parent expressed "disappoint[ment] with [Henry's] living situation." Jordan knew Henry had had a child with her boyfriend and interpreted the remark to mean Henry was living with her boyfriend and raising their child with him, out of wedlock. In April 2009 Jordan and a pastor from the church met with Henry. They discussed her living with her boyfriend and asked whether Henry intended to marry him. Henry said she and her boyfriend intended to get married, but did not know when. She understood that her living arrangement was "contrary to the religious and moral beliefs of the church." Henry knew before she became pregnant that living with her boyfriend was contrary to the teachings of the Bible. The school terminated Henry's employment in May 2009 for *living with* her boyfriend and raising their son together without being married, a "failure to adhere with the Professional Expectations of the teaching staff in that her living arrangements were contrary to the religious beliefs of the church and school."

Henry filed a complaint against the Red Hill Evangelical Lutheran Church of Tustin (erroneously sued as the Red Hill Lutheran School) alleging in the

first cause of action that the church terminated her employment based upon her marital status, in violation of the FEHA. The second cause of action alleged termination based upon her marital status was in violation of public policy as expressed in the FEHA, Title VII, and the state Constitution. (See *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330].)

The court ordered the trial bifurcated with the trial on the church's defenses to be heard first. (Code of Civ. Proc., § 597.) Henry was the only witness to testify. The court also considered all documents filed in connection with an earlier motion for summary judgment. After taking the matter under submission, the court issued a statement of decision and entered judgment in the church's favor. In finding in favor of the church, the court found inter alia that the church is a religious institution, and that Henry's employment was terminated because she violated a church precept.

## II

## DISCUSSION

" 'Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test. Questions of law relate to the selection of a rule; their resolution is reviewed independently. Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently. [Citation.]' [Citation.]" (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384 [112 Cal.Rptr.3d 853, 235 P.3d 152].)

A determination that a trial court has erred, however, does not end the inquiry. "We will not reverse a judgment unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) In the case of civil state law error, this standard is met when 'there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached.' [Citation.]" (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 939 [22 Cal.Rptr.3d 530, 102 P.3d 915].) With these principles in mind we turn to the issues presented.

As stated above, Henry's complaint alleged two causes of action against the church and the trial court entered judgment in favor of the church after

trial on the church's defenses. We first address the FEHA claim and then the issues involved in the second cause of action.

## A. *The FEHA*

Henry's opening brief was devoted exclusively to the ministerial exception and its application—or nonapplication—to her causes of action in this matter. We do not have cause to address the ministerial exception in connection with Henry's first cause of action (the FEHA claim) because the church is expressly exempt from the FEHA claim.

Henry's first cause of action alleged her employment was terminated in violation of sections 12940, subdivision (a) [unlawful for "employer" to discriminate based on marital status or sex] and 12926.2, subdivision (f)(2) [nonprofit public benefit corporation that operates educational institution as sole or primary activity is subject to unlawful discrimination prohibitions] of the FEHA. The church argued that it was not subject to the FEHA. The church is correct.

■ "In enacting the FEHA, the Legislature sought to safeguard the rights of all persons to seek, obtain, and hold employment without discrimination on account of various characteristics, which now include race, religion, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, and sexual orientation. [Citations.]" (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 984 [104 Cal.Rptr.3d 710, 224 P.3d 41].) The FEHA prohibits an "employer" from engaging in acts of improper discrimination. (*Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1182 [72 Cal.Rptr.3d 624, 177 P.3d 232]; § 12940, subd. (a).) Subdivision (d) of section 12926 expressly excludes religious associations or corporations from the definition of employer. " 'Employer' does not include a religious association or corporation not organized for private profit." (§ 12926, subd. (d).)[2] Evidence presented at the trial demonstrated that the church is a religious corporation not organized for private profit. Because the church is not considered an *employer* for purposes of the FEHA, it is not subject to the FEHA's prohibitions. In other words, termination of Henry's employment did not violate the FEHA.

■ Henry's argument that the church is subject to the FEHA under section 12926.2, subdivision (f) is unavailing. That subdivision permits a "nonprofit public benefit corporation formed by, or affiliated with, a particular religion and that operates an educational institution as its sole or primary activity" to

---

[2] The definitions contained in section 12926 are to be used "in connection with unlawful practices, unless a different meaning clearly appears from the context." (§ 12926.)

restrict employment to individuals of a particular religion (§ 12926.2, subd. (f)(1)), but otherwise makes such nonprofit public benefit corporations subject to "the prohibitions against discrimination made unlawful employment practices by this part." (§ 12926.2, subd. (f)(2).) Henry points to no evidence indicating the school operated by the church as part of its ministry is a nonprofit public benefit corporation. (See Corp. Code, § 5110 et seq. [the Nonprofit Public Benefit Corporation Law].) To the contrary, the school has no independent legal status apart from the church.

As stated above, section 12926, subdivision (d) expressly excludes religious corporations not organized for profit from the act's definition of *employer* and the church is just such a religious corporation. (*Silo v. CHW Medical Foundation* (2002) 27 Cal.4th 1097, 1100 [119 Cal.Rptr.2d 698, 45 P.3d 1162].) Accordingly, the trial court properly found for the church on the FEHA cause of action.

B. *Title VII*

 Although the FEHA does not provide a remedy here, a discharged employee may yet be able to recover in tort for wrongful termination if the termination of her employment violated an established public policy. (*Silo v. CHW Medical Foundation, supra*, 27 Cal.4th at p. 1104; see *Tameny v. Atlantic Richfield Co., supra*, 27 Cal.3d at p. 176.) " '[W]hile an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy.' [Citations.]" (*Silo v. CHW Medical Foundation, supra*, 27 Cal.4th at p. 1104.)

"To support a claim for wrongful termination in violation of public policy, a policy must be 'delineated in either constitutional or statutory provisions'; it must be ' "public" in the sense that it "inures to the benefit of the public" rather than serving merely the interests of the individual'; it must have been well established 'at the time of the discharge'; and it must be 'fundamental' and 'substantial.' [Citation.]" (*Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 942 [70 Cal.Rptr.3d 382, 174 P.3d 200].) Such claims "permit wrongful termination damages when a termination is undertaken in violation of a fundamental, substantial and well-established public policy of state law grounded in a statute or constitutional provision. [Citation.]" (*Kelly v. Methodist Hospital of So. California* (2000) 22 Cal.4th 1108, 1112 [95 Cal.Rptr.2d 514, 997 P.2d 1169].) However, a public policy purportedly tethered to the FEHA statutes does not give rise to a cause of action for a wrongful termination in violation of public policy when the claim would be precluded under the FEHA because the act specifically exempts the defendant from the definition of employer. (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 135–136 [32 Cal.Rptr.2d 275, 876 P.2d 1074].)

Henry did not cite in her opening brief any constitutional provision or statute—other than the FEHA (which expressly excludes the church from being considered an employer)—as the source of a public policy violated by her firing. In her reply brief, Henry asserts that "the law does not allow [the church] to discriminate against non-ministerial employees based on gender or marital status." She cites to federal cases dealing with Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), but failed to cite any enactment declaring a public policy against marital status discrimination.

The trial court found the church terminated Henry's employment because she violated a church precept. According to the church, Henry's employment was terminated not because she had a baby out of wedlock, and not because she remained unmarried, but because she continued to live with her boyfriend in a sexual relationship while unmarried. The evidence introduced at trial supports the church's position. After Henry's marriage ended, she lived with her boyfriend and became pregnant. There is no evidence the school's principal or the church knew of Henry's living situation at that time. The church did not terminate Henry's employment for being pregnant. Neither did it fire her when she had the baby out of wedlock. In fact, she gave birth to her son in June 2007 and went back to teaching at the beginning of the next school year, 2007–2008. Henry testified she knew she would not be punished for having had a baby. It was only at the end of 2008, when the principal became aware that parents of children at the school knew of and were talking about Henry living with her boyfriend and raising their child out of wedlock, that Henry was informed by the school that she had to make a choice. Henry knew she was expected to live by the teachings of the Bible and that her living arrangement was "contrary to the religious and moral beliefs of the church."

Had Henry decided to marry her boyfriend, the church would have been satisfied. But the church would also have been satisfied and Henry would have kept her job even if she decided against marrying him. She could have moved out of their shared residence. In fact, after Henry explained to the school board her hesitancy to remarry, one of the school board members specifically asked her, "Why do you have to live with him?" What the church could not allow was to have Henry, its face and representative to the students and parents of the students who attended its school, to continue living in what it considered a sinful manner. In other words, if Henry stopped living with her boyfriend she could continue in her job. That being the case, the evidence at trial indicates her employment was terminated based upon a matter of religion, not her sex and not her having had a baby out of wedlock.

██ Separate and apart from the ministerial exception, 42 United States Code section 2000e-1(a) provides religious institutions with a limited exemption from the terms of Title VII.[3] It exempts religious organizations "from Title VII liability on the basis of religious discrimination. [Citations.]" (*Vigars v. Valley Christian Center* (N.D.Cal. 1992) 805 F.Supp. 802, 805; see *Kennedy v. St. Joseph's Ministries, Inc.* (4th Cir. 2011) 657 F.3d 189, 192, fn. 7 [exemption applied to firing of nurse for violating dress code].) Although the original exemption applied only to personnel decisions in carrying out religious activities, the 1972 amendment expanded "the exemption to include any activities of religious organizations, regardless of whether those activities are religious or secular in nature." (*Kennedy v. St. Joseph's Ministries, Inc., supra*, 657 F.3d at p. 192.)

██ Under Title VII's religious exemption, " '[t]he decision to employ individuals "of a particular religion" under § 2000e-1(a) and § 2000e-2(e)(2) has been interpreted to include decisions to terminate an employee *whose conduct* or religious beliefs are inconsistent with those of its employer.' " (*Kennedy v. St. Joseph's Ministries, Inc., supra*, 657 F.3d at p. 192, quoting *Hall v. Baptist Memorial Health Care Corp.* (6th Cir. 2000) 215 F.3d 618, 624, italics added.) Thus, whereas a religious organization's termination of an employee's employment for becoming pregnant would violate Title VII[4] (*E.E.O.C. v. Fremont Christian School* (9th Cir. 1986) 781 F.2d 1362, 1366 [exemption does not provide immunity for sex discrimination]; *Vigars v. Valley Christian Center, supra*, 805 F.Supp. at p. 805), terminating the employment because the employee committed adultery—a violation of the religious organization's requirement that the employee "live a life in conformity with the fundamentalist beliefs of the church" would not be a violation. (*Id.* at p. 804.) ██ In this case, the evidence at trial supports a finding that Henry's employment was terminated because she was living with her boyfriend in a sexual relationship and was raising their child in that living arrangement, and not because she was a woman or became pregnant or had a baby out of wedlock. As Henry admitted on cross-examination, she understood that "living with [her] child's father and not being married was contrary to the school and church's expectation of [her] as a Christian, setting a Christian role model." The judgment in favor of defendant does not violate any public policy rooted in Title VII.

---

[3] This title (42 U.S.C. § 2000e et seq.) "shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals *of a particular religion* to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." (42 U.S.C. § 2000e-1(a), italics added.)

[4] Title VII prohibits employment discrimination based on sex. (42 U.S.C. § 2000e-2(a)(1).) For purposes of Title VII, discrimination based upon pregnancy or childbirth are included within the terms " 'because of sex' " or " 'on the basis of sex.' " (42 U.S.C. § 2000e(k).)

## C. *The Ministerial Exception*

■ In addition to Title VII and the FEHA, Henry's complaint relied upon the California Constitution (Cal. Const., art. I, § 8 ["person may not be disqualified from entering or pursuing a business, profession, vocation or employment because of sex . . . ."]) as a basis for a public policy purportedly violated by the termination in this matter. Henry contends the ministerial exception does not apply to her. The ministerial exception protects religious organizations from the normally attendant adverse consequences of employment discrimination. The exception is "constitutionally compelled" (*Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 543–544 [10 Cal.Rptr.3d 283, 85 P.3d 67]) and arises out of the establishment and free exercise clauses of the First Amendment.[5] (See *Bollard v. California Province of the Society of Jesus* (9th Cir. 1999) 196 F.3d 940, 948–949.) Because the exception is of constitutional dimension, it exists independent of Title VII or any other statute. (*Shaliehsabou v. Hebrew Home of Greater Washington, Inc.* (4th Cir. 2004) 363 F.3d 299, 306.)

■ "The ministerial exception doctrine is based on the notion a church's appointment of its clergy, along with such closely related issues as clerical salaries, assignments, working conditions and termination of employment, is an inherently religious function because clergy are such an integral part of a church's functioning as a religious institution. [Citation.]" (*Roman Catholic Archbishop of Los Angeles v. Superior Court* (2005) 131 Cal.App.4th 417, 433 [32 Cal.Rptr.3d 209].) Therefore, "secular courts will not attempt to right wrongs related to the hiring, firing, discipline or administration of clergy. Implicit in this statement of the rule is the acknowledgment that such wrongs may exist, that they may be severe, and that the administration of the church itself may be inadequate to provide a remedy. The preservation of the free exercise of religion is deemed so important a principle as to overshadow the inequities which may result from its liberal application. In our society, jealous as it is of separation of church and state, one who enters the clergy forfeits the protection of the civil authorities in terms of job rights." (*Higgins v. Maher* (1989) 210 Cal.App.3d 1168, 1175 [258 Cal.Rptr. 757].)

The ministerial exception is not limited to churches. It extends to "church-related institutions which have a ' "substantial religious character." ' [Citation.]" (*Schmoll v. Chapman University* (1999) 70 Cal.App.4th 1434, 1439 [83 Cal.Rptr.2d 426].) This includes church-affiliated schools. (*Id.* at p. 1436.) Neither is the ministerial exception limited to members of the clergy. (*E.E.O.C. v. Catholic University of America* (D.C. Cir. 1996) 317 U.S. App.D.C. 343 [83 F.3d 455, 461].) The "exception encompasses all

---

[5] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." (U.S. Const., 1st Amend.)

employees of a religious institution, whether ordained or not, whose primary functions serve its spiritual and pastoral mission." (*Id.*, 83 F.3d at p. 463.)

■ "Although the United States Supreme Court has not spoken on the ministerial exception,[6] the lower federal courts have widely embraced it, applying it both to ministers and to a variety of nonordained employees with duties functionally equivalent to those of ministers." (*Catholic Charities of Sacramento, Inc. v. Superior Court, supra*, 32 Cal.4th at p. 544.) The exception applies when the employee's duties primarily " ' " " 'consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in a religious ritual and worship . . . .' " ' [Citation.]" (*Hope Internat. University v. Superior Court* (2004) 119 Cal.App.4th 719, 734 [14 Cal.Rptr.3d 643].) The determination is inherently a factual one and requires the court "to determine whether a position is important to the spiritual and pastoral mission of the church [citation]." (*Rayburn v. General Conference of Seventh-Day Adventists* (4th Cir. 1985) 772 F.2d 1164, 1169.) "If this determination is made in the affirmative, '[t]he rule is about as absolute as a rule of law can be: The First Amendment guarantees to a religious institution the right to decide matters affecting its ministers' employment, free from the scrutiny and second-guessing of the civil courts.' [Citation.]" (*Hope Internat. University v. Superior Court, supra*, 119 Cal.App.4th at p. 734.)

We review Henry's duties at the school to determine whether she "qualifies as a 'spiritual leader' for purposes of the ministerial exception." (*Starkman v. Evans* (5th Cir. 1999) 198 F.3d 173, 175.) As stated above, Red Hill Evangelical Lutheran Church of Tustin operates its school as a part of its ministry. The trial court's statement of decision notes Henry led the students "in prayer at the beginning and end of each day and before each meal." It also found that each Wednesday all five preschool classes, an average of 105 students, and their teachers attend chapel. The teachers rotated responsibility of reading Bible stories and perhaps presenting a lesson to the classes. The court found Henry was responsible for leading chapel up to four times a year. Although Henry's class subjects were mainly secular, the court observed that she "regularly taught religion" in her class. "Outside of class, [Henry] also participated in weekly devotions with the staff at which they would read a

---

[6] On October 5, 2011, the United States Supreme Court heard oral argument in *Hosanna-Tabor Evangelical Lutheran Church v. E.E.O.C.* (10-553)■ a case presenting the question of whether a "called" teacher (see *E.E.O.C. v. Hosanna-Tabor Evangelical Lutheran Church and School* (6th Cir. 2010) 597 F.3d 769, 772) at a sectarian school who teaches a secular curriculum, but who also teaches daily religion classes, comes within the ministerial exception. (<http://www.supremecourt.gov/Search.aspx?FileName=docketfiles/10-553.htm> [as of Dec. 9, 2011].)

devotional-type book and then take prayer requests and pray for each other. From time to time she would lead these staff prayers." Additionally, as we stated above, when the need to discipline a child arose, Henry would "bring in some theme from a Bible story or a teaching of Christianity" to show the student the error in his or her actions. Lastly, the court found that as the director of the preschool, about "once a week [Henry] would conduct tours for parents of student applicants as part of which she would assure the parents of the school's Christian atmosphere."

Henry relies on *E.E.O.C. v. Fremont Christian School, supra,* 781 F.2d 1362, to argue she does not qualify under the ministerial exception because teachers do not " 'fulfill the function of a minister' " and are not " 'intermediaries between a church and its congregation' in that they 'neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine.' " *E.E.O.C. v. Fremont Christian School* involved the question of whether the school could discriminate against married female teachers and provide them less insurance than male teachers (*id.* at p. 1364), not whether a church or school can terminate the employment of one of its teachers for continuing to violate one of its precepts. The court summarily concluded the teachers at the Fremont Christian School did not qualify for application of the ministerial exception, relying upon the Fifth Circuit's opinion in *E.E.O.C. v. Mississippi College* (5th Cir. 1980) 626 F.2d 477, 485. (*E.E.O.C. v. Fremont Christian School, supra,* 781 F.2d at pp. 1369–1370.)

While the fact that a teacher at a college may not be an intermediary between a church and its congregation because that teacher does not "attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine" (*E.E.O.C. v. Mississippi College, supra,* 626 F.2d at p. 485), Henry's position as a church preschool teacher and consideration of her duties requires a different conclusion. For one, Henry's charges are not capable of understanding "the whole of religious doctrine." However, just as one must learn to walk before one can run, Henry introduced her students to Christianity. She gave them the groundwork upon which "the whole of religious doctrine" may later be built. Henry led the children in prayer and when one of Henry's students was in need of discipline, she related to the wayward child a relevant Bible story to show the child the error of his or her action. These are ministerial functions.

We have recognized before that " '[t]he minister is the chief instrument by which the church seeks to fulfill its purpose.' " (*Schmoll v. Chapman University, supra,* 70 Cal.App.4th at p. 1438, quoting *McClure v. Salvation Army* (5th Cir. 1972) 460 F.2d 553, 558–559.) One such purpose is to bring people to the church. Henry fulfilled that function by teaching her preschoolers religion, leading them in prayers every day, and leading chapel services. She taught religion and spread the faith. We find the ministerial exception applies in this matter.

## III

## DISPOSITION

The judgment is affirmed. The church shall recover its costs on appeal.

O'Leary, Acting P. J., and Fybel, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 22, 2012, S199457.