Filed 8/26/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


In re J.P., a Person Coming Under the Juvenile Court Law

SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,

     Plaintiff and Respondent,

     v.

Alejandro G, et al.,

     Defendants and Respondents,

J.P.,

     Appellant.

D065390

(Super. Ct. No. NJ14788B)


APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patricia Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Respondent, Alejandro G.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Respondent Marina P.

J.P., a minor child, appeals an order denying her request for a hearing to suspend visitation with her father and/or terminate his reunification services under Welfare and Institutions Code section 388, subdivisions (a) and (c).[1] Specifically, she contends the juvenile court erred when it ruled that (1) the statutory framework of the dependency system as well as principles of due process required the juvenile court to hold a six-month status review hearing to determine whether reasonable services were offered or provided to the parent before it could consider a request to terminate reunification services under section 388, subdivision (c), and (2) the allegations in the child's section 388 petition did not state a prima facie case to show that the action or inaction of the parent created a substantial likelihood family reunification would not occur, or that a modification of the prior visitation order was in the child's best interests.

---

[1] Unless otherwise specified, further statutory references are to the Welfare and Institutions Code.

2

We conclude that the juvenile court misinterpreted section 388, subdivision (c) when it denied J.P.'s request for a hearing to terminate her father's reunification services. While section 388, subdivision (c) requires a reasonable services finding, the juvenile court is not required to hold a six-month review hearing to determine whether reasonable services have been offered or provided to a parent *before* it holds a hearing on a petition to terminate reunification services under section 388, subdivision (c). The reasonable services finding required under section 388, subdivision (c) may be made at a hearing on the petition. In addition, terminating reunification services before the statutory reunification period has ended does not violate a parent's due process rights where the parent's action or inaction has created a substantial likelihood that family reunification will not occur. Where there is a substantial likelihood the child will not be reunited with his or her parent as a result of a parent's action or inaction, the child's interests in a safe, permanent home takes precedence over the parent's diminished interests in the child. In addition, the juvenile court erred when it found that J.P.'s petition to terminate her father's reunification services and/or suspend visitation did not state a prima facie case.

We nevertheless conclude reversal is not necessary to avoid a miscarriage of justice. In view of the lack of any challenge on appeal to the juvenile court's findings at the six-month review hearing that visitation was not detrimental to the child, and the father was making progress with his case plan and it was likely that

3

reunification would occur by the next review hearing, any error in not granting a hearing on the section 388 petition is harmless. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

J.P., born March 2009, is the daughter of Marina P. and Alejandro G. Alejandro and Marina had a brief romance while Alejandro was separated from his wife, with whom he has three children. Before J.P.'s dependency proceedings began, Alejandro visited J.P. four times. He last saw her in approximately March 2012. Alejandro made regular child support payments and maintained health care insurance for J.P.

On March 8, 2013, the San Diego County Health and Human Services Agency (Agency) detained J.P. and her two half-brothers[2] in protective custody after Marina's boyfriend severely physically abused J.P. J.P. remained in the hospital for a month while she recovered from a pancreatic injury, malnourishment, and at least 38 fractures, including a fractured hip, which were deliberately inflicted by her mother's boyfriend. He subjected J.P. to acts of cruelty, including requiring her to stand in a cold shower for extended periods of time, up to and including all day, while fully clothed, and spanked J.P. with clothes hangers, causing her to bleed.[3] (*In re J.M.* (May 9, 2014, D065121) [nonpub. opn.]; *In re J.M.* (June 10, 2014, D065252) [nonpub. opn.].) Additional

2      This appeal only concerns J.P.

3      The perpetrator was charged with 21 counts of willful cruelty to a child and one count of torture for severely physically abusing J.P. He was sentenced to nine years in prison. (*In re J.M*, *supra*, D065252.)

4

acts of physical and emotional abuse and maltreatment are detailed in this court's nonpublished opinions, *In re J.M.*, *supra*, D065121 and *In re J.M.*, *supra*, D065252, and we need not repeat all the details here. Suffice to say J.P. suffered unimaginable acts of cruelty that left her physically battered and emotionally traumatized.

Alejandro appeared at the jurisdiction and disposition hearings. The juvenile court found that Alejandro was J.P.'s adjudicated biological father. The court assumed jurisdiction over J.P. and her brothers, and removed them from parental custody. Due to her extended hospitalization, J.P. was placed in a separate foster home from her brothers. The juvenile court denied family reunification services to Marina, who knew that her boyfriend was physically abusing J.P. and failed to intervene, and ordered a reunification services plan for Alejandro consisting of supervised visitation and conjoint therapy with J.P. The juvenile court authorized the social worker to expand Alejandro's supervised visits with J.P. and permit unsupervised and overnight visits, and a 60-day visit, with the concurrence of minor's counsel.

J.P. was diagnosed with posttraumatic stress disorder (PTSD). She had intense tantrums and nightmares. Her foster mother, who was a mother and grandmother and had been a foster parent for 17 years, said J.P. was the most challenging child she ever had in her care. J.P. sought safety and security, and often fell asleep on the floor next to her foster mother's bed. The foster mother and her husband loved J.P. but were not in a position to adopt a young child.

5

The social worker talked to Alejandro about the importance of maintaining regular contact with J.P. to establish and strengthen their relationship. The social worker was aware that Alejandro's travel time to visit J.P. was approximately two and a half hours each way, and that his financial circumstances were stressed and he was at risk of losing his home.

The foster mother set up weekly visits on Sunday evenings and offered Alejandro the opportunity to have another visit the following day if he wished to stay overnight in San Diego.

J.P.'s first visit with her father occurred on June 14, 2013. Alejandro said the visit was "awesome." According to J.P.'s foster mother, J.P. appeared to recognize her father when she first saw him. However, J.P. pulled away from her father when he hugged and kissed her goodbye.

After the June 24 visit, J.P. referred to "daddy Alex," adding, "but he's a stranger." She told her foster mother she did not like it when he hugged her, saying, "I'm a little bit scared of him." When Alex abruptly cancelled his visit on June 25, J.P. cried and said, "He hurt my feelings."

Alejandro cancelled his visit on July 1. He visited J.P. on July 7, 14 and 21. On July 26, J.P. told her foster mother, "I'm scared of my daddy Alex and I don't like my visit." Later, while playing "visit" with another child, J.P. said, "The girl is scared because her daddy is a stranger. So, she should sit next to the lady and try not to be scared."

6

Alejandro visited J.P. on August 4. He cancelled the August 11 visit. J.P. was on vacation in late August with her foster family. Alejandro did not telephone to check on her well-being.

In early October, Alejandro became upset when he arrived for a visit and learned that the foster mother would be present. Alejandro left the visitation center without acknowledging J.P., who saw him drive away. J.P. rejected the explanation he later gave to her for leaving, saying "He's a liar."

J.P. told her foster mother, her therapist and the social worker that she did not want to visit her father.

On October 20, J.P. waved to Alejandro when she arrived but hesitated to walk up to him. She stayed close to the foster mother during the visit. J.P. was introduced to Alejandro's wife and children. She was very shy. During a visit on October 27, J.P. was very bossy, which was out of character. She became hyperactive and started talking baby talk. J.P. would not sleep in her own bed that night. She began engaging in risky behaviors, including suddenly running out into a parking lot, stuffing food into her mouth until she choked, and jumping off a high bed. The following week, J.P. cried for 20 minutes because she did not want to go to the scheduled visit. When Alejandro cancelled at the last minute, J.P. said "yay" and appeared to be happy.

In early November, Alejandro cancelled several visits, saying he was on pain medication for a leg injury and could not drive long distances. He also complained about the foster mother being present at the visits. In mid-November,

7

Alejandro asked the social worker to suspend visits. His wife had learned that he had picked up J.P.'s mother from jail when she was released and, as a result, Alejandro and his wife were experiencing significant marital discord. In addition, Alejandro had filed for bankruptcy and was working six days a week to support his family and pay child support for J.P.

In December, J.P. told her attorney (minor's counsel) she did not want to visit her father. Minor's counsel filed a section 388 petition on January 6, 2014[4] seeking termination of Alejandro's reunification services and/or suspension of visitation. The juvenile court set the initial hearing on the petition for January 28, the date of the previously scheduled six-month review hearing.

In mid-December, Alejandro asked the social worker to resume visitation. Visits were scheduled for January 16 and 23, 2014.

J.P. continued to insist that she did not want to visit Alejandro. She questioned why the social worker was arranging visits when J.P. kept telling her she did not want to go on any more visits. When J.P. learned that the foster mother would not be at the visits, J.P. cried until the foster mother was able to distract her.

---

4    There is a discrepancy between the reporter's transcript and the clerk's transcript. The reporter's transcript shows that the juvenile court stated on January 6, 2014, that minor's counsel had filed a section 388 petition, and set an initial hearing on the petition for January 28, the same date as the previously scheduled six-month review hearing. The clerk's transcript shows that the section 388 petition is file stamped January 28, 2014. When there is a discrepancy between the record transcript and the clerk's transcript, the reporter's transcript generally prevails as the official record of the proceedings. (Cf. *Arlena M. v. Superior Court* (2004) 121 Cal.App.4th 566, 569-570.)

On January 28, the juvenile court stated that it had read and considered J.P.'s section 388 petition and the social worker's report, and was familiar with the facts of the case. The juvenile court determined J.P. did not meet her burden to establish a prima facie case that visitation should be suspended or modified. The court said there was no need to grant the request to modify or suspend visitation because the court's order directed the parties to structure visitation in a manner in which J.P. felt comfortable and to have a "safe person" present at all visits. The court also denied without prejudice a hearing on J.P.'s petition to terminate Alejandro's reunification services, ruling that the statutory scheme and principles of due process required the court to make a reasonable services finding at a six-month review hearing before it could consider terminating a parent's reunification services.

With respect to the six-month review hearing, minor's counsel was not in agreement with the social worker's recommendation to continue reunification services to Alejandro for six months.

The social worker supervised visits between J.P. and Alejandro on July 28 and October 20, 2013, and January 16 and 23, 2014. In July, the social worker observed that Alejandro was very engaging and playful with J.P. J.P. went easily and willingly to her father but did not display any physical affection with him. At the October 20 visit with Alejandro and his family, J.P. relaxed as the visit progressed. The family played games, and played the piano and sang. On January 16, Alejandro visited J.P. for the first time since October 27. Before the

9

visit, Alejandro talked with J.P.'s therapist about J.P.'s needs for safe boundaries. During the visit, when another child asked her to play, J.P. said, "No, I'm playing with my dad." After the visit, J.P. told her therapist she felt happy playing with her father. J.P. told her foster mother she did not feel as scared as she had felt during earlier visits. At a visit on January 23, J.P. allowed Alejandro to help her with her scooter helmet. J.P. told her foster mother she felt "a little bit safe" with her father.

The social worker reported that Alejandro had struggled with all aspects of his case plan and needed to be more proactive in his efforts to reunify with J.P. However, she believed that Alejandro was making an effort to respect J.P.'s boundaries and meet her emotional needs. The social worker hoped J.P. would become less fearful of her father if he showed a growth in commitment to her, became better educated about her needs, and maintained consistent contact with her. The social worker recommended that Alejandro receive six more months of reunification services.

The juvenile court found that Alejandro was "now making progress with his case plan" and that he was provided reasonable reunification services. Minor's counsel then renewed her request for a hearing on J.P.'s petition to terminate Alejandro's reunification services under section 388, subdivision (c). The court denied the request on the grounds the petition did not state a prima facie case to show that reunification would not occur and that terminating reunification services

under section 388, subdivision (c) at the six-month hearing would violate Alejandro's due process rights.

DISCUSSION

I

*THE ISSUES ON APPEAL*

J.P. contends the juvenile court erred as a matter of law in denying a hearing on her section 388 petition. She challenges the ruling that the juvenile court cannot grant a hearing on a request to terminate reunification services under section 388, subdivision (c) until it has made a reasonable services finding at a six-month status review hearing. She also contests the ruling that granting a hearing on the section 388 petition prior to a six-month status review hearing would infringe on the parent's due process rights. In addition, J.P. contends the juvenile court erred when it determined that the section 388 petition did not state a prima facie case that a modification of the prior visitation order was in her best interests, or there was a substantial likelihood that reunification would not occur.

The Agency does not address J.P.'s arguments concerning the juvenile court's interpretation of section 388, subdivision (c) and its ruling that holding a section 388 hearing to terminate a parent's reunification services before the six-month hearing violates the parent's due process rights, thus implicitly acknowledging the juvenile court misinterpreted the law. Instead, the Agency argues J.P. does not meet her burden on appeal to show that the juvenile court

11

clearly abused its discretion in denying a hearing because the petition failed to state a prima facie case.

## II

*THE COURT IS NOT REQUIRED TO HOLD A SIX-MONTH REVIEW HEARING BEFORE HOLDING A HEARING ON A PETITION TO TERMINATE REUNIFICATION SERVICES UNDER SECTION 388, SUBDIVISION (C)*

### A

*Statutory Framework*

"Family reunification services play a 'crucial role' in dependency proceedings." (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 563, quoting *In re Joshua M.* (1998) 66 Cal.App.4th 458, 467.) When a child is removed from the physical custody of his or her parent, the juvenile court is required to offer or provide family reunification services to the child's mother and presumed father, and has the discretion to offer or provide reunification services to the child's biological father. (§ 361.5, subd. (a).)

However, in some circumstances, the juvenile court need not order reunification services to a parent at the disposition hearing under section 361.5, subdivisions (b) or (e) (the reunification bypass provisions). For example, reunification services need not be provided to a parent who has severely abused a child, either sexually or physically; caused the death of another child; willfully abandoned the child; has a history of extensive, chronic drug use and has resisted treatment or failed to comply with a drug or alcohol treatment program on at least

12

two prior occasions; failed to reunify with the child's sibling and has not subsequently made a reasonable effort to treat the problems that led to the sibling's removal; or who is incarcerated or institutionalized and providing services to that parent would be detrimental to the child.  (§ 361.5, subds. (b), (e).)

Family reunification services, when provided, are subject to time limitations.  For a child who was three years of age or older on the date of the initial removal from the physical custody of his or her parent, court-ordered services shall be provided beginning with the dispositional hearing and ending 12 months after the date the child entered foster care[5] unless the child is returned home.  (§ 361.5, subd. (a)(1)(A).)  For a child who was under three years of age on the date of the initial removal from the parent's custody, or for a child who is a member of a sibling group,[6] court-ordered services shall be provided for a period of six months from the dispositional hearing but no longer than 12 months from the date the child entered foster care, unless the child is returned home.  (§ 361.5, subd. (a)(1)(B), (C).)  Thus, generally, the statutory scheme envisions that a parent of a child who is three years of age or older will have 12 months to mitigate the

[5]     The date the child entered foster care is defined as the earlier of the date of the jurisdictional hearing or the date that is 60 days after the date on which the child was initially removed from the custody of his or her parent.  (§ 361.49.)

[6]     A "sibling group" means two or more children who are related to each other as full or half-siblings and who were removed from parental custody at the same time, and in which one member of the sibling group was under three years of age at the time of removal.  Court-ordered services may be limited to six months to the members of the sibling group who are three years of age or older for the purpose of placing and maintaining a sibling group together in a permanent home should reunification efforts fail.  (§ 361.5, subd. (a)(1)(C).)

conditions that led to the initial removal and continued custody of the child, whereas a parent of a child who is under three years of age, or who is a member of a qualified sibling group, will have only six months in which to reunify. (See *In re Marilyn H*. (1993) 5 Cal.4th 295, 308.) The juvenile court must review the case at least once every six months. (§ 366.)

At each review hearing, if the child is not returned to the custody of his or her parent, the juvenile court is required to determine whether reasonable services that were designed to aid the parent in overcoming the problems that led to the initial removal and the continued custody of the child have been offered or provided to the parent (reasonable services finding). (§ 366.21, subd. (e), (f).) Generally, the remedy for not offering or providing reasonable reunification services to a parent is an extension of reunification services to the next review hearing. (§ 366.21, subds. (e), (g)(1); see *In re Tracy J*. (2012) 202 Cal.App.4th 1415, 1424, 1428.)

Any motion to terminate court-ordered reunification services prior to the 12-month review hearing for a child who is three years of age or older, or prior to the six-month review hearing for a child who is under three years of age or who is a member of a qualified sibling group, shall be made pursuant to section 388, subdivision (c). (§§ 361.5, subd. (a)(2), 388, subd. (c)(1).) A motion to terminate court-ordered reunification services is not required at a six-month review hearing if the court finds by clear and convincing evidence that the whereabouts of the child's parents are still unknown, the parent has failed to contact and visit the

14

child, or the parent has been convicted of a felony indicating parental unfitness. (§ 361.5, subd. (a)(2).)

Section 388, subdivision (c) provides that any party, including a child who is a dependent of the juvenile court, may petition the court, prior to the applicable review hearing, to terminate court-ordered reunification services only if one of the following conditions exist: (1) it appears that a change of circumstances or new evidence exists that satisfies a condition set forth in the reunification bypass provisions under section 361.5, subdivision (b) or (e); or (2) the action or inaction of the parent creates a substantial likelihood that reunification will not occur, including, but not limited to, the parent's failure to visit the child, or the failure of the parent to participate regularly and make substantive progress in a court-ordered treatment plan. (§ 388, subd. (c)(1)(A), (B).) In determining whether there is a substantial likelihood that reunification will not occur, the court is required to consider factors such as the parent's incarceration, institutionalization, federal immigration detention, deportation, or participation in a court-ordered residential substance abuse treatment program. (§ 388, subd. (c)(2).)

The court shall terminate reunification services only upon a finding that reasonable services have been offered or provided, and upon a finding by clear and convincing evidence that one of the conditions of section 388, subdivision (c)(1)(A) or (c)(1)(B) exists. (§ 388, subd. (c)(3).)

15

B

*Standard of Review and Principles of Statutory Construction*

The interpretation of a statute is a legal issue, which we review de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800.)  In construing a statute, we look to the words of the statute to determine legislative intent and to fulfill the intent of the law.  (*Gooch v. Hen*drix (1993) 5 Cal.4th 266, 282.)  Where the language of the statute is clear and unambiguous, we follow the plain meaning of the statute and need not examine other indicia of legislative intent.  (*In re Alanna A*. (2005) 135 Cal.App.4th 555, 563.)  The language is construed in the context of the statute as a whole and the overall statutory scheme, and courts give significance to every word, phrase, sentence and part of an act in pursuing the legislative purpose.  (*People v. Canty* (2004) 32 Cal.4th 1266, 1276.)  The term "shall" is mandatory and the term "may" is permissive.  (§ 15.)

C

*Analysis*

In denying the request for a hearing on J.P.'s section 388 petition, the juvenile court explained:

> "When you have a child over the age of three, the statute says it is the burden of the Agency to establish [] the statutory criteria.  The parents have a due process right to hold the Agency to their burden.  And usually at a six-month review for a child over the age of four, the primary consideration in that regard is whether or not reasonable services have been offered or provided.

16

"Here there appears to be no disagreement that reasonable services were offered or provided. So I think that the due process rights of the parents compels the court to follow the statutory scheme under the Supreme Court precedent that there be continuity of our statutory scheme in the rollover nature for findings in all of these hearings. The Legislature made a specific exception for children under the age of three, but did not do so for children over the age of three, and that's because of the developmental considerations that come into play. So I do believe that a 388 motion at a six-month review for a child over three where there is no dispute as to reasonableness of the services is actually premature, and if heard contemporaneously or prior to the [six-month review] findings, would endanger the parents' due process rights of holding the Agency to [its] burden."

The juvenile court's interpretation of section 388 is incorrect.

Section 361.5, subdivision (a)(2) and section 388, subdivision (c)(1) each provide that a motion to terminate reunification services for a child who was three years of age or older at the time of removal may be made "prior to the hearing set pursuant to subdivision (f) of Section 366.21." The hearing under section 366.21, subdivision (f), commonly referred to as "the 12-month review hearing," shall be held no later than 12 months after the child entered foster care. (§ 366.21, subd. (f).) This language is clear and unambiguous. (*In re Alanna A.*, *supra*, 135 Cal.App.4th at p. 563.) Nothing in the language of section 388, subdivision (c) limits the authority of the juvenile court to consider terminating a parent's reunification services until after the six-month review hearing has been held.

Further, neither the statutory framework of the dependency system nor principles of due process require the juvenile court to continue to provide

17

reunification services to a parent where a party can show, by clear and convincing evidence, that a condition set forth in section 361.5, subdivision (b) or (e) exists as to that parent, or that the action or inaction of that parent creates a substantial likelihood that reunification will not occur. (§ 388, subd. (c).) The juvenile court has the authority at the disposition hearing to deny services to a parent under a reunification bypass provision. (§ 361.5, subds. (b), (e).) If the existence of such a reunification bypass condition is brought to the juvenile court's attention after the disposition hearing on a showing of changed circumstances or new evidence, the termination of reunification services on those grounds completely comports with the dependency framework. It would contravene the purpose of the dependency system to be required to attempt to reunify a child with a parent who, for example, has been sentenced to a lengthy prison term, has committed a violent felony, or has been found to have committed severe physical harm or severe sexual abuse to the child or the child's sibling, unless reunification is in the best interest of the child. (§§ 300.2, 361.5, subds. (b), (c), (e); *In re Y.M.* (2012) 207 Cal.App.4th 892, 918 [juvenile court erred when it did not grant child's petition to terminate reunification services to her father under § 388, subd. (c) after he was incarcerated on charges of transporting the child with the intent to engage in criminal sexual activity].)

In enacting section 388, subdivision (c), the Legislature did not distinguish between the two alternative grounds for terminating reunification services prior to the completion of the applicable review period. The statutory requirements that

18

govern termination of reunification services where a reunification bypass provision is found to apply, also govern a petition to terminate reunification services to a parent whose action or inaction has created a substantial likelihood that reunification will not occur. (§ 388, subd. (c)(1).) Where a parent is not creating or maintaining a relationship with his or her dependent child by regularly visiting or contacting the child, and is not participating and making progress in court-ordered reunification services, it is not premature to consider terminating reunification services to that parent prior to the six-month review hearing. "Childhood does not wait for the parent to become adequate." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) There is a "limitation on the length of time a child has to wait for a parent to become adequate." (*Id.* at p. 308.) Where a party establishes a prima facie case under section 388, subdivision (c), granting a hearing on the merits comports with the Legislative directive to the juvenile court to "give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (*In re Marilyn H.*, *supra*, at p. 308, citing § 352, subd. (a).)

In addition, the plain language of section 388, subdivision (c) requires the juvenile court to make a reasonable services finding before it may terminate reunification services to a parent. (§ 388, subd. (c)(3).) Thus, it is not necessary to hold a six-month review hearing prior to hearing a motion to terminate reunification services in order to make a reasonable services finding.

19

The juvenile court ruled that a parent[7] has a due process right to a six-month review hearing in which the government must return the child to the parent's custody unless it proves "the return of the child to his or her parent would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e).) The juvenile court cited "the Supreme Court precedent" discussing the repeated findings that ensure a parent's due process rights are not violated. The juvenile court was no doubt referring to *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242 (*Cynthia D.*), in which our Supreme Court stated:

> "Considered in the context of the entire process for terminating parental rights under the dependency statutes, the procedure specified in section 366.26 for terminating parental rights comports with the due process clause of the Fourteenth Amendment because the precise and demanding substantive and procedural requirements the petitioning agency must have satisfied before it can propose termination are carefully calculated to constrain judicial discretion, diminish the risk of erroneous findings of parental inadequacy and detriment to the child, and otherwise protect the legitimate interests of the parents." (*Cynthia D.*, *supra*, at p. 256.)

---

7    In assessing the right to a six-month review hearing, the juvenile court did not consider Alejandro's status as J.P.'s biological father. "[A] biological father's 'desire to establish a personal relationship with a child, without more, is not a fundamental liberty interest protected by the due process clause.' " (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 160.) A biological father's rights in his child's dependency proceedings are limited to establishing his right to presumed father status, and the court does not err by terminating his reunification services, when granted, when he has had the opportunity to establish presumed father status by forming a parental relationship with the child, and has not done so. (Cf. *In re A.S.* (2009) 180 Cal.App.4th 351, 362.) Thus, holding a hearing under section 388, subdivision (c) prior to the six-month review hearing did not implicate Alejandro's due process rights as a biological father.

There is no doubt that due process guarantees apply to dependency proceedings. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222.) Section 388, subdivision (c) meets the "precise and demanding substantive and procedural requirements" required under *Cynthia D.* to safeguard a parent's fundamental interests in his or her child. Before a party files a petition under section 388, subdivision (c), the juvenile court has already determined the child cannot be safely maintained in the parent's home, or that placement with a noncustodial parent would be detrimental to the child. (§§ 361, subd. (c), 361.2, subd. (a).) The parent has been offered or provided reasonable reunification services and has had the opportunity to mitigate the conditions that led to the child's placement in out-of-home care. (§ 361.5, subd. (a).) A party must establish a prima facie case to be entitled to a hearing on the merits of a section 388 petition. (§ 388.) Before it may terminate reunification services, the juvenile court must find by clear and convincing evidence that section 388, subdivision (c)(1)(A) or (c)(1)(B) applies, and that the parent has been offered or provided reasonable reunification services. (§ 388, subd. (c)(3).) A finding that a condition exists that would have justified a bypass of reunification services at the disposition hearing, or that there is a substantial likelihood reunification will not occur because of the action or inaction of the parent, is equivalent to a finding of detriment. At that point, "it has become clear 'that the natural parent cannot or will not provide a normal home for the child,' and the state's interest in finding the child a permanent alternate home is fully realized." (*Cynthia D.*, *supra*, 5 Cal.4th at p. 256, quoting *Santosky v.*

21

*Kramer* (1982) 455 U.S. 745, 767.)  Thus, when there has been a judicial determination that reunification is unlikely to be effectuated, it becomes inimical to the interests of the child to delay permanency and "heavily burden efforts to place the child in a permanent alternative home."  (*Cynthia D*., *supra*, at p. 256.)

We conclude that the statutory scheme in which a party has the right, on a prima facie showing, to *a hearing* on the merits of a petition to terminate a parent's reunification services prior to the six-month review hearing does not violate due process.[8]

III

*THE PETITION MADE A SUFFICIENT PRIMA FACIE*
*SHOWING FOR A HEARING ON ITS MERITS*

The juvenile court erred when it determined the petition did not state a prima facie case to show it was in the child's best interest to modify the prior visitation order because of changed circumstances and there was a substantial likelihood that reunification would not occur because of the action or inaction of the parent.

Under section 388, a party "need only make a prima facie showing to trigger the right to proceed by way of a full hearing."  (*In re Marilyn H*., *supra*, 5 Cal.4th at p. 310.)  The prima facie showing is not met unless the facts

---

8       We are not holding that terminating reunification services to the child's mother or presumed father prior to a six-month review hearing *after a hearing on the merits* may never implicate the parent's due process rights.  (See generally *In re Dakota H*. (2005) 132 Cal.App.4th 212, 222-224 [due process depends on the competing interests at stake].)

22

alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258.) The petition must be liberally construed in favor of its sufficiency. (Cal. Rules of Court, rule 5.570(a); *In re Marilyn H.*, *supra*, at p. 309.)

On January 6, 2014, minor's counsel filed a section 388 petition alleging Alejandro did not consistently visit J.P. He last saw her on October 27, 2013, and last telephoned her on October 9, 2013. Alejandro did not speak to J.P.'s therapist about her needs. Alejandro was discharged from the visitation center for missing three consecutive visits. He did not want J.P.'s foster mother to attend any visits, even though the foster mother's presence calmed and comforted J.P. J.P. was very clear about her desire not to visit Alejandro. She told all the professionals and important adult figures in her life that she did not want to visit him. J.P. did not feel safe with Alejandro. Alejandro put his own needs ahead of J.P.'s needs. He had picked up J.P.'s mother from jail and lied about it to the social worker. Alejandro did not understand complex trauma and was not able to meet J.P.'s needs.

The petition further alleged J.P. was a victim of serious physical abuse. According to her therapist, J.P. was making progress but it would be a long time before she healed. When J.P. voiced her opposition to visiting Alejandro and then

23

had to attend the visits despite her fears, it interfered with her sense of safety and well-being and did not promote the healing process. J.P.'s father had not shown much interest in, or progress towards, developing a safe and supportive home for J.P., and it was therefore in her best interest to shift the focus of her case from reunification to permanency and stability.

In view of the factual and procedural history of the case, these allegations, if supported by evidence given credit at the hearing, are sufficient to sustain a favorable decision on the petition. (*In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 806.) J.P. was severely traumatized, both physically and emotionally, by severe physical abuse. Her need for a stable, permanent home in which she felt safe and secure was of critical importance to her current and future well-being. Alejandro was a stranger to her. After J.P.'s birth, Alejandro chose not to establish a relationship with J.P., placing his and his wife's needs above those of his child. Alejandro's status throughout the dependency proceedings was as J.P.'s biological father. To his credit, Alejandro participated in J.P.'s dependency proceedings and expressed an interest in reunification. However, Alejandro did not consistently visit J.P. and did not make a prompt effort to understand the nature of her complex needs. J.P. did not feel safe with him. When other matters demanded Alejandro's attention, J.P.'s interests in family reunification were shelved for almost half of the first six-month review period. When J.P. learned visits with Alejandro were to resume, she became distressed. She was frustrated with the social worker, saying the social worker "just keeps telling me I'm gonna visit daddy Alex and I keep

telling her I don't want to."  Although she was only four years old, J.P. insisted that the court, social worker, minor's counsel and her foster mother should respect her wishes not to visit Alejandro.

In view of J.P.'s circumstances, the allegations in her petition are sufficient to state a prima facie case that visitation was detrimental to J.P. and a modification of the prior visitation order appeared to be in her best interests, and the inaction of the parent created a substantial likelihood that reunification would not occur. Thus, the juvenile court erred in denying a hearing on J.P.'s petition to modify the prior visitation order and/or terminate Alejandro's reunification services.

IV

*THE ERROR DOES NOT REQUIRE REVERSAL*

The determination that the juvenile court has erred, however, does not end our inquiry.  " 'We will not reverse a judgment unless "after an examination of the entire cause, including the evidence," it appears the error caused a "miscarriage of justice."  (Cal. Const., art. VI, § 13.)  In the case of civil state law error, this standard is met when "there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." ' " (*Henry v. Red Hill Evangelical Lutheran Church of Tustin* (2011) 201 Cal.App.4th 1041, 1048, quoting *Elsner v. Uveges* (2004) 34 Cal.4th 915, 939.)

In view of the juvenile court's uncontested findings at the six-month review hearing that visitation was not detrimental to J.P., and that Alejandro was making substantive progress with the provisions of his case plan and it was likely that

25

reunification would occur, and the lack of any challenge on appeal to those findings, we conclude that a result more favorable to J.P. would not have been reached in the absence of error.  (*Elsner v. Uveges*, *supra*, 34 Cal.4th at p. 939.)

In reaching this conclusion, we also keep in mind that if, during the pendency of this appeal, the resumed visits appeared to be detrimental to J.P., or Alejandro did not fully comply with the reunification services plan, any party, including the child, was able to petition the juvenile court to modify the prior visitation order or terminate reunification services.  (§ 388, subds. (a), (c); see *In re Anna S*. (2010) 180 Cal.App.4th 1489, 1499, 1501-1502 [juvenile court retains authority and duty to make orders in accordance with the California dependency scheme during the pendency of an appeal].)  Thus, there was an adequate remedy at law, and reversal to avoid a miscarriage of justice is not required.

## DISPOSITION

The order is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


McDONALD, J.

26