Filed 11/20/15  In re T.T. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re T.T., a Person Coming Under the Juvenile Court Law. | B261539 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK01252) |
| Plaintiff and Respondent, | |
| v. | |
| CATHERINE L., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Teresa Sullivan, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Catherine L. (Catherine) is the presumed mother of T.T., born December 2003. T.T. was detained from Catherine in 2013. In December 2014, the juvenile court held a combined hearing pursuant to Welfare and Institutions Code section 366.21, subdivisions (e) and (f),[1] at which it found that the Department of Children and Family Services (DCFS) had offered Catherine reasonable family reunification services, and it ordered such services to continue for an additional six months.

On appeal, Catherine urges that the "reasonable services" finding was not supported by the evidence because there had been no conjoint therapy between herself and T.T.

We need not reach the merits of Catherine's appeal because, even assuming the reunification services offered were not reasonable, Catherine has already been granted the additional reunification services to which she claims to be entitled. In any event, on the merits we conclude that the juvenile court's "reasonable services" finding was amply supported by the record. We therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Detention

T.T. came to the attention of DCFS on September 3, 2013, when officers stopped a car driven by Catherine, also known as Segmet T., in which T.T. was a passenger. Catherine initially refused to disclose her name and she said she was a United States diplomat and an international ambassador for the Supreme Heavenly Light Facilitator. Catherine's car did not have a license plate, and Catherine gave the officer a hand-made plaque saying the vehicle was a mobile embassy vehicle. Catherine claimed to be exempt from all California laws. When the police officer asked T.T. a question, Catherine told him not to answer and to "only talk to mommy." Law enforcement fingerprinted

---

[1]     All subsequent undesignated statutory references are to the Welfare and Institutions Code.

Catherine and, after determining that she had an outstanding warrant from 2004 in connection with a charge of kidnapping, arrested her and placed her in custody.

In an interview with a children's social worker (CSW), Catherine claimed her real name was Segmet T. and that "Catherine" was her older sister. Catherine said she was T.T.'s biological mother, and Pablo F., also known as Ptah T., was T.T.'s biological father. Catherine said she had home-schooled T.T. since he reached school age, and she denied any prior DCFS history.

T.T. told the CSW that he did not know his mother's or father's real names. He denied being physically abused and said he was not upset by Catherine's incarceration. He appeared healthy. He was detained and placed in foster care.

A review of DCFS's records revealed that in 2002, Pablo's three children (born to a different mother) had been detained in connection with allegations that Catherine severely emotionally abused them.[2] The children were placed with their mother, and Catherine was ordered not to have any contact with them. The same year, Catherine and Pablo were arrested and convicted of kidnapping the children from their mother's home.[3]

DCFS filed a juvenile dependency petition on September 6, 2013. The petition alleged jurisdiction over T.T. pursuant to section 300, subdivisions (b) and (g) on the grounds that Catherine was incarcerated on September 3, 2013, and failed to make an appropriate plan for T.T.'s care and supervision. The juvenile court found a prima facie case for detaining T.T. and ordered him temporarily placed in foster care.

---

[2]     According to a DCFS report, Catherine was alleged to have physically abused Pablo's children, restricted their diet as a form of punishment, forced the children to sleep on the floor and to eat their own vomit, and subjected them to public humiliation.

[3]     When the children were located at Catherine and Pablo's home, Catherine accused the officers of trespassing and refused to let them in the house. The standoff ended only when officers forced the door open with a hook and ram and forcibly removed the children.

## II.

## T.T.'s Parentage

A deputy sheriff interviewed Ericka P., who was subsequently determined to be T.T.'s biological mother, on September 13, 2013. Ericka said she met Catherine and Pablo, whom she knew as Segmet and Ptah, in 2002. In 2003, Segmet and Ptah "began to give her guidance. They were on a higher spiritual level. They were helping her to walk the path. They started meeting regularly. [Segmet's] mother Virginia was present at some of the meetings. They learned that [Ericka] was pregnant. She was in a difficult time in her life. She was separated from her other two children. She had financial issues. She was having trouble spiritual[ly]. She said that on a spiritual level she was told by Segmet that she was carrying Segmet's child. She had a vision that she was a surrogate mother for Segmet. She was being guided on her path by Segmet. She said that her life is guided, when she is given guidance she follows it. This child was a special spiritual child. [She believed] [t]hat Segmet and Ptah being of a higher spiritual level could raise him better. She said it was like the 'Dalai Lama.' She gave birth to a boy. Her boy was born at Segmet's home in Compton. Segmet was the only person present at the birth."

On September 27, 2013, the court ordered the dependency petition amended to identify Ericka as T.T.'s biological mother. It found that substantial danger existed to T.T.'s physical and emotional well-being and no reasonable means existed to protect him without removing him from Ericka. The court appointed counsel to assist Catherine in filing a motion to be declared T.T.'s presumed mother, and it ordered Catherine not to have any contact with T.T. until her legal status was determined.

In December 2013, the juvenile court granted Catherine presumed mother status. It subsequently granted her limited monitored visitation with T.T. in a therapeutic setting.

## III.

## Jurisdiction and Disposition

### A.    *Jurisdiction/Disposition Report*

The jurisdiction/disposition report, dated October 23, 2013, said T.T.'s biological mother, Ericka, did not wish to have custody of T.T.  She refused to provide any information about T.T.'s biological father.

T.T.'s foster mother, Monica, said she greatly enjoyed having T.T. in her home and found him to be a very polite and sweet child.  He had no behavioral problems.  However, T.T. could barely read and struggled with basic math.  T.T.'s classroom teacher gave a similar report.  She said he got along well with his peers and was very respectful towards others, but performed academically well below grade level.  She said T.T. could recognize numbers, but she was not sure that he could add or subtract and he was reading at a first grade level.

A mental health assessment reported that T.T. was friendly and outgoing and was not exhibiting any problems at home or at school.  When asked about his foster care placement, he said he liked living with Monica and said he thought he would live with her forever.  He said he felt "good" about this plan.  Based on the foregoing, DCFS recommended that the court sustain the amended petition.

On October 22, 2013, the CSW told T.T. that Catherine was not his biological mother.  T.T. said he was surprised, and he disclosed for the first time that Catherine spanked him when she was angry, usually with a belt.  He said the spankings were "not hard enough to harm me, just to hurt me."  When asked whether Catherine ever embarrassed him as a form of discipline, he said she once made him go outside in a ripped shirt so others could see him.  He also said that he "didn't really have any feelings about" not seeing Catherine again; he subsequently said he did not want to see her again "because she'd spank me or hit me.  Sometimes she'd make me do push-ups or squats or something like that."  He said he preferred living with his foster mother because she cared more for him and let him be more of a child.

*B.     Second Amended Petition*

DCFS filed a Second Amended Petition on January 13, 2014.  As subsequently amended, it alleged:  Catherine disciplined T.T. by striking him with a belt, requiring him to exercise excessively, and forcing him to wear a ripped shirt in public (a-1, b-6); Ericka abandoned T.T. to Catherine, who had an outstanding warrant for child stealing (b-1, g-1); Pablo created a detrimental and endangering situation for T.T. by allowing Catherine unlimited access to T.T. and by failing to provide T.T. care and supervision (b-2, g-2); Catherine failed to establish a legal plan of custody for T.T. and failed to enroll him in school, hindering his academic growth and development (b-3); and Catherine was convicted in 2002 of child stealing and failed to comply with the terms of her release, resulting in a warrant for her arrest (b-4).

*C.     Addendum Reports*

A February 3, 2014 addendum report said Catherine denied forcing T.T. to wear a ripped shirt, using excessive exercise as a form of discipline, or physically disciplining T.T. other than on one occasion.  She claimed to have learned of Ericka's pregnancy only a few weeks before T.T. was born, and said she had not known Ericka was going to give her T.T.  She said she kept T.T.'s identity secret because Ericka "begg[ed]" her to.  She claimed to have taken T.T. for medical care, but could not provide any specific information.  She said she did not have any medical insurance for T.T. because he did not have a social security number.

T.T.'s therapist, Dr. Juterbock, urged that it was not in T.T.'s best interests to participate in conjoint therapy with Catherine.  Subsequently, Dr. Juterbock reported that during a joint session on February 3, T.T. asked that Catherine sit on a couch and that he sit next to the therapist with his back to Catherine.  T.T. asked that Catherine be in the therapy room for only five minutes.  During the session, Catherine told T.T. that "she is his mommy, that mother did not abandon him, that there is information [T.T.] is not aware of, and that she loves him.  [T.T.] spent the time coloring, remained silent, and continued to face his back towards [Catherine]."  After Catherine left the session, T.T.

6

said he " 'did not listen to her' " and " 'blurred her out.' " He asked if the next session could be only four minutes and if he could wear earplugs.

During the next joint session, T.T. again asked to sit with the therapist with his back to "the other lady" (Catherine), and asked the therapist to ask " 'the other lady' " to " 'be quiet' " if she attempted to talk to him. Catherine sat on the couch, but told T.T. " 'mommy is here' " and " 'mommy is fighting for you.' " T.T. asked that Catherine leave the session after five minutes. Subsequently, the foster mother reported that Catherine had waited for them in the parking lot. The therapist opined that it was in T.T.'s best interest to discontinue conjoint therapy and asked that any further visits between Catherine and T.T. take place in a different setting "so [the] therapist can focus on [T.T.'s] individual needs during his therapy."

In a March 6, 2014 "Last Minute Information for the Court," DCFS advised that since the last court order, there had been two DCFS-supervised visits between Catherine and T.T. During the first visit, on February 24, T.T. sat with his back to Catherine and refused to speak to her or answer her questions. He acknowledged that he was upset with her by shaking his head, but he refused to explain why. After 40 minutes, T.T. told the CSW he was uncomfortable and the visit was concluded. He subsequently told the CSW he was unhappy about the visits, did not like being asked to speak up in front of Catherine, and did not want to return to her because she was physically abusive. A second DCFS-supervised visit took place on March 4. T.T. again chose to sit with his back to Catherine. Catherine "informed T.T. that she brought [some of his belongings] and he would have to turn around to take them from her. . . . T.T. indicated he did not want the items. [Catherine] pointed out that T.T. knew better about how to act and pointed out this was not how she raised her son. This prompted a discussion with [the CSW] about which topics and behaviors were appropriate. [T.T.] did follow instructions to express what he was whispering to [the CSW] so [Catherine] could overhear. [T.T.] stated he did not want to turn the chair around and that he was uncomfortable. [Catherine] stated that [T.T.]'s behavior is influenced by [the CSW] and others. She stated to [T.T.], 'You will be coming home to me and that is a fact.' The decision was

7

made to end the visit at this time, after 30 minutes, because [T.T.] continued to express he wanted to leave. [The CSW] spoke to [T.T.] once again about [Catherine's] current order for reunification services and her learning appropriate parenting behaviors to eliminate the child's concerns about the abuse he has disclosed. T.T. stated that this made no difference to how he felt. [The CSW] informed [Catherine] that the visit was concluded for the day."

### D. *Jurisdiction/Disposition Hearing*

The court held a contested jurisdiction/disposition hearing on February 19, 2014. Following argument, the court found by a preponderance of the evidence that paragraphs a-1, b-1, b-3, b-5, b-6, and g-1 were true as alleged, and paragraphs b-2, b-4 and g-2 were true as amended. The court further found by clear and convincing evidence that there would be substantial danger to T.T. if he were returned home, and there were no reasonable means by which T.T.'s physical and emotional health could be protected without removing him from Catherine's custody. Finally, the court (1) ordered a psychological evaluation of Catherine and a bonding study of Catherine and T.T., (2) granted Catherine one hour per week of DCFS-monitored visitation with T.T., and (3) ordered Catherine to participate in both individual counseling and conjoint counseling with T.T., as recommended by T.T.'s therapist.

### IV.

### Section 730 Evaluation

On June 4, 2014, the court appointed Dr. Clive Kennedy to conduct an Evidence Code section 730 evaluation of Catherine and T.T. Dr. Kennedy submitted his report to the court in July 2014.

T.T. told Dr. Kennedy that Catherine had whipped him with a belt, although he could not say how often. He said he was happy with his foster mother because "[s]he doesn't hit me or whip me." T.T. appeared self-conscious about his academic deficits.

Per Dr. Kennedy, Catherine minimized T.T.'s low academic performance, "consistently failing to take responsibility for any of his difficult[ies]. She alluded to a law suit against the County for causing his problems. She also failed to acknowledge any

8

responsibility for the decision to not disclose [T.T.]'s true maternal history. [¶] . . . [Catherine's] responses continue to suggest an effort to present a socially acceptable front and resistance to admitting personal shortcomings. Overall, her general approach to psychological testing is guarded and defensive. Yet, there are personality traits evident in her testing with clinically significant elevations in Histrionic and Narcissistic personality traits and features. There were no clinical syndromes readily apparent."

Dr. Kennedy continued: "It is likely that this adoptive mother displays exaggerated and short-lived emotions, is flirtatious and flighty, lacks insight, and integrates her experiences poorly. Her judgment may be undependable and highly erratic. Equally significant is that her surface affability may often be upset by impulsive, angry outbursts. She may appear charming to casual acquaintances, but those with more enduring relationships with her are likely to see her testy, irritable, and manipulative side. An exploit[at]ive pattern may be taken with friends and within family settings. Quite characteristically, she may offer only fleeting and superficial displays of affection in return for having others meet her demands. . . . [¶] . . . [¶] Also salient is her strong sense of self-satisfaction and self-worth, exhibited in public displays of her admirable traits and accomplishments, which often lead others to see her as egotistical, inconsiderate, or arrogant. She feels justified in her claim for special status and has little conception that her behavior may be objectionable, even irrational. She believes that she is a special person who deserves great admiration from others."

Dr. Kennedy recommended as follows: "Although changing personality traits can be difficult at best with considerable effort and follow through, some therapists have had varying degrees of success. Much of the work will involve individual psychotherapy. Yet, occasional family or conjoint sessions will also be essential to maintain motivation, encouragement, and to address relationship issues. [¶] . . . [¶] [Catherine's] tendency to avoid responsibility will need to be replaced with attitudes such as apology for not being truthful, not being responsive to [T.T.'s] needs, and a commitment to his happiness and success. [¶] Therapy sessions should not be dictated by the minor. Multi-systemic approaches that require Mom and Son to be together with a therapist are essential. . . . [¶]

9

If [Catherine] becomes unwilling to cooperate in therapy, or is unable to learn empathy or relationship skills to strengthen attachment, while incorporating effective parenting strategies, the court may be required to honor [T.T.]'s requests to remain in foster care, and terminate parental rights."

# V.

## Six and Twelve Month Review

A.      *Six Month Status Review Report*

DCFS submitted a six month status review report, dated September 23, 2014. T.T. was doing well in his current placement and wished to be adopted by his foster mother. He had attended five DCFS-supervised visits with Catherine and then began refusing to get out of the car at the DCFS office to participate in any additional visits. He said he felt uncomfortable around Catherine because "she used to hit me, I can see now how it is to be with a good family, and she didn't tell me she wasn't my mom." When the CSW suggested that T.T.'s feelings could be addressed in conjoint therapy sessions, he said, "I don't care, I am not going into a room with her, I don't want to visit or see her ever again." When asked to dictate a few words to the court, T.T. said, "I'm not going to be going back with her ever. Also, I really don't care to see her or hear about her, don't care for her letters or anything. I don't want to talk to her or meet with her ever in my life."

On September 16, 2014, T.T. refused to get into his caregiver's car to attend his weekly visit with Catherine, and he informed the CSW that he would continue to refuse to attend visits. The CSW attempted to encourage and explain to T.T. "how reunification works, how parents can learn new things about parenting, and how the goal for him is to return to the care of his mother. . . . CSW Keisari has been adamantly working and speaking with [T.T.] about attending and participating in his weekly visits, to which he continues to refuse. CSW Keisari has been unsuccessful in getting [T.T.] to participate after [exploring] many different avenues[,] . . . including[] reminding him the visitation is a Court order, that he does not have a choice, that he can enter the visit and not speak, that mother is learning how to better parent him and working on reunification, etc. It appears that, at this time, there has been no success."

10

T.T. continued to express to his therapist, Dr. Juterbock, a strong desire not to participate in any conjoint sessions with Catherine. Dr. Juterbock said T.T. had acknowledged that things had happened to him that he had not yet disclosed, but she said the more she tried to explore these things with T.T., the more closed off he became. She therefore was stepping back to allow him to disclose things in his own time. She believed it was not in T.T.'s best interests to visit with Catherine at the present time because he had such strong feelings about not visiting. Dr. Juterbock said it was "of grave concern" to her that T.T. "may be continually forced into situations where he is clearly unwilling to participate. [T.T.] has been very consistent in letting me know that he does not feel safe with [Catherine] and that she made him do things in the past that were frightening and painful for him." Dr. Juterbock concluded that she did not believe conjoint therapy sessions "would be conducive to [T.T.'s] therapeutic progress."

In a letter to the court, T.T. said that "the reason why I do not want to go into [meetings with Catherine] is because she would hit me. . . . And also, sometimes she would spank me and she would have me do horse stands for an hour or two.[4] It would really hurt and my legs would be really sore after. [¶] For the running, even if it was really hot outside she would still have me run. Even if it was night and I had done something bad, I would still have to run. [¶] Sometimes she would have me sleep outside if I did something wrong. It was never a good time because it would be cold out there. Sometimes there would be bugs."

Mother's therapist said mother had attended 12 sessions with the therapist. He did not believe there is a "pathology present and see[s] no reason not to implement the recommendation for conjoint therap[y] with [T.T.]." DCFS reported that Catherine was "dedicated to the reunification process" with T.T., and participated in therapy and parenting classes. Catherine continued to tell DCFS that she believed T.T. was being given too much power and that he was being influenced by others. Catherine did not

---

**4**     T.T.'s drawing of a "horse stand" depicted him in a half squat with his knees bent, his back against a wall, and his upper legs and arms parallel to the floor.

believe DCFS was adequately working with her to accomplish the court-ordered visitation, and she believed T.T.'s sessions with Dr. Juterbock were not beneficial and that T.T. needed a male therapist who supported reunification.

Based on the foregoing, DCFS recommended that "it would be a detriment to [T.T.]'s well being to return home. Due to the ongoing refusal of [T.T.] to even be in the same room as [Catherine] and his strong opinions and feelings on being in her care, and/or even seeing her, it appears to be detrimental for reunification to occur at this time."

On September 23, 2014, the court set a contested review hearing pursuant to section 366.21, subdivisions (e) and (f).

### B.    *12-Month Status Review Report*

The 12-month status review report, dated November 13, 2014, reported that T.T. continued to refuse to visit or attend therapy with Catherine. DCFS recommended that Catherine's family reunification services be terminated.

### C.    *Hearing*

At a December 17, 2014 hearing, Catherine's therapist, Osas Otasowie, testified that Catherine had begun to make significant progress in therapy in about October 2014. She had begun to express humility and appreciation for DCFS's intervention, as well as to take responsibility for difficulties with T.T. Otasowie recommended conjoint therapy between Catherine and T.T. to give Catherine "the opportunity to verbalize, to bring closure to that child, . . . to express her apology in person to that child, and at least give the child the opportunity to make some informed decisions."

Catherine testified that she had come to realize that she "[was not] using the best techniques as far as discipline," and that T.T.'s medical care and schooling had "not be[en] up to par." She admitted disciplining T.T. with a belt, forcing him to wear ripped shirts in public, and requiring him to exercise excessively as forms of punishment. She said she had begun to adopt "more of an understanding, accountable position versus feeling so subject to attack."

12

After hearing testimony, the court made a finding that the services offered by DCFS were reasonable, and that it "[did] not fault the Department in its attempts at servicing the family as this is a very unique and challenging set of circumstances." However, "[t]here clearly is a necessity for the child to have another place to go where there can be an opportunity to welcome some kind of dialog about what's going on. [¶] The court is very concerned that, whether it's the child's opportunity to confront the mother or the mother's opportunity to apologize, that these relationships will live long after this Court hearing. [¶] And to allow the parties to walk away in such a damaged state would be a horrible disservice to them."

The court found both mother and DCFS in compliance with the case plan, noting that Catherine had made significant progress in resolving the issues that had led to T.T.'s removal and had demonstrated "the capacity and the ability to complete the objectives of the treatment plan." Further, the court found that under the unique circumstances of this case, it was appropriate to extend the reunification period: "I . . . find that, like many of the cases that come before this Court, the statutory time frame is not always consistent with the parent's therapeutic time line, and that the services that [Catherine] has been able to receive, with the combination of the support I believe that she was receiving from [her individual therapist] created the necessary safety for [Catherine] to address the issues that needed to be addressed to provide for this family's healing. [¶] And that prior to that time, despite the clock ticking, [Catherine] was not making any progress. [¶] It has only been since that time that mother has really been able to make the progress that was needed to address the issues. [¶] So rather than make a no-reasonable-efforts finding, I'm just extending mother's opportunity to continue the work that she has begun." The court also ordered DCFS to continue to provide counseling for T.T. with Dr. Juterbock, but also to provide additional counseling with another therapist "to find a way to get to the root of the child's refusal to meet with [Catherine]." The court concluded that the "goal for the next six months is to try to have some movement, or at least some information directly from [T.T.] about what's going on."

Catherine timely appealed the December 17, 2014 order.

13

**DISCUSSION**

Catherine contends the juvenile court abused its discretion in finding that DCFS had provided her reasonable reunification services. Specifically, she urges that the reunification services she received were *unreasonable* because there were no conjoint counseling sessions between her and T.T. after February 2014. For the reasons that follow, we reject Catherine's contentions and affirm.

**I.**

**Justiciability**

At the six-month and 12-month review hearings, the juvenile court must consider, among other things, whether DCFS has provided a parent "*reasonable services . . . designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child.*" (§ 366.21, subds. (e) & (f), italics added; see also *In re J.P.* (2014) 229 Cal.App.4th 108, 121-122.) If the services offered were not reasonable, the court shall "[c]ontinue the case for up to six months." (§ 366.21, subd. (g)(2).)

Here, although the juvenile court concluded at the 12-month review hearing that Catherine had received reasonable reunification services, it nonetheless extended her services for six months to allow her additional time to reunify with T.T. In other words, although the court did not make the *finding* Catherine sought (i.e., that DCFS had not afforded reasonable services), it made the *order* to which she claims to have been entitled. As a result, even were we to agree with Catherine that she was not offered reasonable reunification services, we would not reverse any order of the juvenile court because Catherine has already obtained the very order to which she claims to have been entitled.

Under these circumstances, the issue Catherine raises on appeal is an " ' "abstract or academic question[] of law," ' [citation], since we cannot render any relief to [Catherine] that would have a practical, tangible impact on [her] position in the dependency proceeding." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.) We therefore need not address it on the merits. (*Id.* at p. 1490 ["An important requirement for

14

justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status. ' " ' "It is this court's duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' " ' " ' "].)

Catherine contends that notwithstanding our inability to afford her any practical relief, we should exercise our discretion to consider the adequacy of the services offered to her because the "reasonable services" finding could have consequences for her in the future. We do not agree. While we indisputably have discretion to reach the issue of reasonable services (see *In re I.A.*, *supra*, 201 Cal.App.4th at p. 1493), we need not do so here because Catherine has not specified any legal or practical consequence from this finding, either within or outside the dependency proceedings. To the contrary, she merely suggests in her reply brief that "[u]nless the [finding] is reversed, . . . the prejudice to [her] from the ruling will come later, at each successive phase of the proceedings." Thus, although she raises the "specter of a future impact" (*Id.* at pp. 1494-1495), she fails to identify any way in which this finding actually could affect a future dependency or family law proceeding.

## II.
### The Juvenile Court's Reasonable Services Finding Is
### Supported by Substantial Evidence

Alternatively, we conclude that the juvenile court's reasonable services finding was amply supported by the record. " 'The adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the

15

parents in areas where compliance proved difficult. . . .' (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) [¶] We review the evidence most favorable to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)" (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 691, italics omitted.) " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.]" (*Id.* at p. 692.)

Catherine urges that she was not offered reasonable services because she and T.T. did not participate in conjoint counseling during the reunification period. The lack of conjoint counseling, however, was not because of any failure on the part of DCFS, but rather because neither T.T. nor Catherine was ready for it. Early in the reunification period, DCFS facilitated two conjoint counseling sessions between Catherine and T.T.; during both sessions, T.T. sat with his back to Catherine and refused to engage with her. At the suggestion of T.T.'s therapist, joint sessions therefore were discontinued. DCFS nonetheless continued to provide T.T. with regular individual therapy in the hopes of helping to ready him for future joint sessions; as of December 2014, no such joint sessions had yet occurred because T.T.'s therapist believed he was not yet ready for them and that such sessions would not "be conducive to [T.T.'s] therapeutic process."

The record reflects, moreover, that prior to December 2014, conjoint sessions would not have improved the relationship between Catherine and T.T. because for most of the reunification period, Catherine was unwilling or unable to accept responsibility for any mistreatment of T.T. In June 2014, Dr. Kennedy noted that Catherine exhibited narcissistic and histrionic traits and "consistently fail[ed] to take responsibility for any of [T.T.'s] difficult[ies]." While he recommended "occasional" conjoint therapy sessions to "maintain motivation," he suggested that "[m]uch of the work will involve individual psychotherapy" to help Catherine substitute her "tendency to avoid responsibility" with "attitudes such as apology for not being truthful [or] responsive to [T.T.'s] needs." By all accounts, Catherine did not begin to exhibit any signs of remorse or change until at least

16

October 2014.  It therefore is highly unlikely that conjoint sessions with T.T. prior to that time would have had any positive effects on their relationship.

Finally, although DCFS did not provide conjoint counseling, it did provide many other services to attempt to help this family heal.  Both Catherine and T.T. received intensive individual counseling, and DCFS monitored (or attempted to monitor) weekly visits between them.  Although T.T. resisted visits, his CSW continued to speak to him about the importance of reunification and regular visits, exploring "many different avenues . . . including[] reminding him . . . that mother is learning how to better parent him."

Reunification services "need not be perfect" and they should "be tailored to the specific needs of the particular family."  (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.)  Here, the services offered were appropriately tailored to the family's needs: individual therapy was provided to both T.T. and Catherine, with the goal of making future conjoint therapy possible and productive.  Accordingly, we conclude that substantial evidence supported the juvenile court's finding that Catherine received reasonable reunification services.

## DISPOSITION

The juvenile court's December 17, 2014 order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

LAVIN, J.