Filed 11/14/22  M.E. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| M.E., <br><br>     Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF SAN MATEO COUNTY, <br><br>     Respondent, <br><br> SAN MATEO COUNTY HUMAN SERVICES AGENCY CHILDREN AND FAMILY SERVICES, et al., <br><br>     Real Parties in Interest. | A166054 <br><br><br> (San Mateo County <br>  Super. Ct. No. 21JD0383) |

M.E. (mother)[1] seeks extraordinary writ relief from an August 25, 2022 order terminating reunification services between her and her 14-year-old child ("the child") and setting a hearing under Welfare and

---

[1]      The child's father is not a party to this writ proceeding.

Institutions Code section 366.26[2] to consider termination of parental rights and the child's permanent placement.

Mother seeks reversal of the order based on a single argument, that the juvenile court's finding that she had been offered or provided reasonable reunification services cannot be sustained because the agency did not provide court-ordered in-person visitation (except on one occasion). We find no merit to mother's argument and, accordingly, we deny the petition for an extraordinary writ on the merits. We also deny as moot mother's related request for a temporary stay of the section 366.26 hearing set for December 19, 2022.

**FACTS**

**A.    Background**

In November 2021, real party in interest San Mateo County Human Services Agency Children and Family Services (the agency) filed a petition under section 300, subdivisions (b) (failure to protect) and (c) (serious emotional damage), asking the court to assume jurisdiction over the then 13-year-old child.

The petition contained the following allegations. Mother's "ongoing substance abuse and unaddressed mental health issues" jeopardized the child's safety and placed the child at substantial risk of harm and neglect. Mother had been diagnosed with bipolar disorder and polysubstance dependence and had an extensive history of mental health and addiction issues. Since the child's birth in May 2008, the child had been twice declared a court dependent (May 2008 to April 2010 and April 2015 to October 2016) based on substantiated

---

[2]    All undesignated statutory references are to the Welfare and Institutions Code.

2

allegations of mother's neglect. Despite three years of reunification and family maintenance services, mother continued to abuse alcohol and drugs. The child reported that mother's substance use (alcohol and presumed methamphetamine) escalated mother's emotional volatility and anger, resulting in verbal and physical altercations between them.

Mother's unaddressed substance abuse and mental health issues had also caused the child to become depressed, suffer anxiety, and engage in self-harming behaviors, thereby placing the child's safety and emotional well-being at risk. The child had been diagnosed with major depressive disorder and post-traumatic stress disorder based on suicidal ideation, incidents of body-cutting, and an attempt to overdose with over the counter medication resulting in a psychiatric hospitalization. The child felt unsafe in the home based on mother's threat to physically assault and actual physical assault of the child (hitting the child in the face with her open hand).

**B.     November 15, 2021 Detention Hearing**

At the November 15, 2021 detention hearing, mother was present and represented by counsel. The court found mother's testimony was not credible. The court found the child was a person described in section 300, subdivisions (b) and (c), the agency was granted custody of the child for placement in a foster care home, and mother was granted supervised in-person visits of two hours twice a week for a total of four hours and supervised "[v]irtual visitation." The agency was directed to provide the following reunifications services to mother: alcohol and drug testing; substance abuse treatment; parenting education; and counseling.

### C. February 23, 2022 Combined Jurisdictional and Dispositional Hearing

Before the February 23, 2022 combined jurisdictional and dispositional hearing, the agency filed several reports with the court concerning the status of mother's participation in reunification services and visitation.

The agency social worker ("social worker") reported that mother had been given referrals and arrangements were made for her attendance at anger management classes and for alcohol and other drug (AOD) assessment, but mother had not participated in any of the offered services. Mother was scheduled to drug test on six dates in January 2021 but failed to appear on those dates. Mother was also scheduled for three additional drug tests, which were apparently missed because mother's telephone was not functioning.

The social worker had asked the child to participate in an in-person visit on six dates, but the child did not want to visit mother. However, on February 13, 2022, the child sent a text message – " 'I want to visit my mom' " – and the social worker scheduled a supervised in-person visit for February 16. The social worker also reported that mother had sent the child "harsh messages via text and Instagram DM" that indicated mother did not believe the child's mental health issues had anything to do with the way she treated the child.

Mother was not present at the jurisdictional and dispositional hearing, but she was represented by counsel. The child was present and represented by counsel. The juvenile court considered the agency's reports and the child's testimony.

4

The juvenile court found true the allegations as stated in the petition and declared the child a dependent of the court.  Having found that mother had made no progress in alleviating or mitigating the causes necessitating the child's out of home placement and that the child would be at substantial risk if returned to mother, the court granted the agency custody of the child for continued placement in a foster family home.

The court granted mother reunification services, specifically directing her to participate in the following services as part of her case plan: (1) mental health assessment and, if appropriate, therapeutic services including individual and/or family therapy; (2) a 16-week anger management program; and (3) outpatient substance abuse treatment and substance abuse testing at least once a week.  The court also granted mother supervised in-person visits of two hours, twice per week.

### D.     The Agency's Section 388 Motion to Terminate Reunification Services/Six-Month Status Review

On August 12, 2022, the agency filed a section 388 motion seeking an order terminating mother's reunification services at the six-month status review.  The social worker asserted that since February 23, 2022 when dependency was declared and reunification services were ordered, mother had "expressed multiple times that she does not want reunification services," and the child did not want to reunify with mother and was interested in exploring permanency options through adoption or guardianship.  The social worker further asserted that termination of reunification services would be better for the child because "the family" did not wish to reunify and the child was "now in

5

need of a permanent plan." As far as the social worker knew, mother and the child agreed with the agency's request to terminate services, but the positions of counsel for mother and counsel for the child were then unknown. The court ordered the section 388 motion to be heard with the six-month status review.

The agency also filed a report to be considered at the six-month status review. The social worker reported on the efforts made to encourage mother to participate in court-ordered case plan services, specifying the dates on which mother was contacted concerning services (December 2021 through July 27, 2022), and mother's responses or lack of response. While mother initially stated she was willing to engage in some reunification services and was given referrals, mother did not actually participate in any services. The social worker reported that when mother was questioned about her participation in services, mother responded with emails stating, among other things, that she felt she had lost custody of the child due to the child's false attempted suicide and the child's false statements about mother's conduct, and mother was no longer willing to participate in services as she did not expect that the child would be returned to her custody.

The social worker also reported on efforts made to arrange for supervised in-person visits and other forms of communication between mother and the child. Since the agency's last reports to the court, the social worker had spoken to the child on four occasions and asked the child to visit with mother, but the child declined all visits stating mother's voice "triggered" the child and the child preferred to have written contact with mother. The social worker told mother that the child was not ready for in-person visits. Mother was offered other

6

means of contacting the child, including virtual visits. However, she declined, stating she would participate only in in-person visits. The social worker also discussed the possibility of arranging visits between mother and child with a therapist but mother would be required to complete a Clinical Parenting and Needs Assessment to participate in such visits.

Mother had contacted the child through Facebook and the child had responded with a statement that child missed mother but needed space. Mother opined that the child did not understand the seriousness of the case, and the child did not seem to understand that adoption was permanent if there were no reunification. Mother also opined that the agency was giving the child "too much autonomy" as the child was "too young" to make these decisions. The social worker agreed to continue to encourage the child to visit mother.

In April 2022, the child asked to write a letter to mother. After agreeing to have the social worker review the letter, the child wrote a letter to mother, and the letter was given to mother. Mother's only response was a text message to the social worker saying, " 'Thank you for the letter I appreciate it.' " While the social worker encouraged mother to write back, mother did not respond to the child's letter. When the child was told mother had not written back, the child expressed an intent to send another letter to mother. The child wrote another letter that was to be given to mother together with a clay dish that the child had made, but mother did not respond to the agency's notification that the child had prepared another letter and gift for mother.

7

The agency also reported on the child's circumstances in the out-of-home placement since February 2022. The child had stabilized in a therapeutic foster care home. The child was actively engaged in individual, behavioral, and group therapy, and was being treated by a psychiatrist who oversaw the child's psychotropic medications. The foster parents were not able to commit to the child's permanent placement in their home but were committed to caring for the child until the child returned home or secured a permanent placement.

In its assessment and evaluation, the social worker reported that the child stated a belief that the child's return to mother's care would be detrimental to the child's mental and physical safety, and the child was adamant that death was preferable to reunifying with mother. The child preferred to work on having healthy communications with mother, hoping to build an emotionally safe relationship, but wanted to pursue other permanent options. As to mother's situation, the social worker reported that mother had not engaged in any reunification services, had been hostile to social workers and proposed service providers, and had made it clear she would not engage in any case plan. On July 22, 2022, mother sent a text in which she referred to the child using negative and hostile language and stated once more that she was not interested in reunifying with the child, sentiments that mother had communicated multiple times throughout the dependency.

### E. August 25, 2022 Hearing on Section 388 Motion and Six-Month Status Review

At the August 25, 2022 hearing, neither mother nor child were present, but both were represented by counsel. The court confirmed that the hearing would include rulings on both the agency's section 388

8

motion to terminate reunification services and the six-month status review.

The court commenced the hearing by noting it had read, reviewed, and considered the agency reports prepared for the previous hearings and the six-month status review, which reports were admitted into evidence without objection. The court also heard testimony from the social worker who had been assigned to the case since July 7, 2022 and had prepared the section 388 motion and the report for the six-month status review.

The social worker testified that during the past six months after the child had been placed in her current foster care home, mother had one in-person visit with the child; the visit "did not go well and it was ended early." While mother stated she only wanted in-person visits, the social worker offered virtual visits and telephone calls; mother refused to participate in those forms of communication. Additionally, the child had written to mother stating the child wanted to start communication by letters, but mother had not responded to the child's letter. The social worker confirmed that the child had prepared a second letter and gift for mother, but mother had not responded to the social worker's text and so the letter and gift had not been delivered to mother. The social worker also stated that at one time mother had indicated she was willing to participate in "DYAD" (parent-child) therapy. However, that type of therapy was not available because the child's service providers had indicated the child was not ready for DYAD therapy.

The social worker further testified that the agency's recommendation to terminate services would not change if it were true,

9

as mother had alleged in her texts, that the child had not attempted to commit suicide in November 2021. While the child's purported suicide attempt was part of the allegations in the sustained petition, the incident was "only a small part" of the agency's concern about mother's conduct toward the child, including mother's "emotional and physical abuse" of the child and the "ongoing mental health issues" of both mother and the child.

In response to the court's questions, the social worker confirmed that mother was not willing to accept communications with the agency, with mother stating that if any attempt at communication was made mother would change her contact information.

Counsel for the agency and counsel for the child urged the juvenile court to terminate mother's reunification services and set a section 366.26 hearing. In pertinent part, the child's counsel specifically argued that mother had not and clearly indicated she would not engage in any reunification services; in addition, the child did not want reunification. Counsel also asked the court to consider that during an earlier proceeding, the child had appeared in court, and "we witnessed an extremely resilient, young [child] express [the] one great fear in life . . . that [the child] would be forced to go back to . . . [mother] and be subject, again, to additional physical and emotional abuse, . . . suffered at the hands of . . . mother for many years."

Mother's counsel urged the court not to terminate reunification services, explaining that mother had made clear throughout the dependency that she had mental health issues that needed to be addressed, at times she was willing to participate in counseling and DYAD therapy, she was willing to visit the child albeit she was only

10

willing to agree to in-person visits, which had not been provided for a number of reasons including that the child was not ready for in-person visits, and while mother did not want to participate in court proceedings, she "still wants to direct how things go."

The juvenile court explained its reasons for granting the agency's section 388 petition to terminate reunification services, as follows:

> "While . . . [mother] is willing, in theory, to have in-person visits with [the child], that is not what [the child] wants. . . . [M]other is not willing to start with Zoom and start gently. [The child] is. That is the irony of this young child who has been subjected to physical and emotional abuse at the hands of . . . mother, yet [the child] is still willing and we see this all the time, to kind of open a dialogue with . . . mother through a letter or through a Zoom visit, and it is mother that refuses to respond to those letters and have any contact with [the child] unless it is on her terms, which is in person. And they tried that, and it didn't go so well. And I think it was difficult for [the child] – very difficult for [the child] emotionally. [The child] gets triggered. [¶] So it's mother that is refusing. In the six months, mother has refused any and all services here. So to say she is willing to meet in person and therefore she is willing to participate in reunification services is really not the answer to this situation. [¶] Mother is clearly not participating in reunification services. The record is replete with her responses which are filled with bad language. And it clearly demonstrates . . . that I think that mother has some serious mental health issues. But we can't even get her to the table to look at those mental health issues so that we can try and provide [the child] with an environment that is without physical and emotional abuse at the hands of . . . mother. [¶] So I think the Agency . . . did the right thing by filing the [section] 388 motion here because mother is refusing to participate in reunification services. [¶] . . . [¶] So the Court does find that the Agency has proved by clear and convincing evidence that mother's inaction, in this case, lead to a substantial likelihood that reunification . . . will not occur. Mother is not participating in reunification services, and I do so find by clear and convincing evidence. [¶] . . . [¶] I also find, in this case, that continued reunification services are not in the best interest of

[the child]. And I do find that it is appropriate to terminate those services at this time. [The child] does not want to participate in in-person visits with . . . mother on . . . mother's terms, although [the child] is willing to . . . write . . . letters and open a dialogue. But it is not in [the child's] best interest, at this time, to have in-person visits with mother. . . . [¶] So based on the fact that mother has had six months of services and has clearly demonstrated that she is not willing to participate in reunification services and it is not in [the child's] best interest, at this point, to continue with reunification services – mother has made zero progress in her treatment plan – the Court is going to grant the [section 388] motion at this time. And that is based on everything that I have read, reviewed and considered in this case as well as the testimony of [the social worker]. [¶] So the Court is going to terminate reunification services to mother."

In addressing the additional findings to be made following a six-month status review, the court stated, in pertinent part, as follows:

"The Court also finds that the Agency has provided reasonable services in this case. Several social workers continue to reach out to mother in different forms – by e-mail, by text – and mother continues to refuse to participate or respond to them except in a litany of bad language, which is all reflected in the report. [¶] So I do find . . . and I don't know if the standard is by clear and convincing evidence that reasonable services were offered. I believe that may be that standard. And if so, I do so find. [¶] And I also find . . . by clear and convincing evidence that mother has failed to participate regularly and ma[k]e substantial progress in the case plan. [¶] And is there a substantial probability that [the child] may be returned within the six months to . . . mother, absolutely not. That is not the Court's finding. [¶] Therefore, the Court is going to terminate reunification services and set this matter for a .26 hearing. [¶] . . . [¶]

"As it relates to the . . . [six month status review], does the Court find by [a] preponderance of the evidence that the return of the child to the physical custody of the parent would create a substantial risk of detriment to the child's safety, protection, or physical well-being; yes, the Court so finds. [¶] . . . [D]oes the

12

Court find by clear and convincing evidence that the parent has failed to contact or visit with the child for six months? Well, that's an interesting question. What I have found is that there was one visit. It didn't go so well. So I think she has failed to contact or visit the child in the last six months. [¶] . . . [¶] But does the Court find by clear and convincing evidence that reasonable services were offered; yes. [¶] . . . [¶] Therefore, the Court may terminate reunification services and set a .26 hearing."

Pending the section 366.26 hearing, the court granted mother visits of a minimum of one supervised two-hour in-person visit each month and directed that "[s]upervised video chats, phone calls and letters are permitted at the discretion" of the social worker.

## DISCUSSION

Mother challenges the juvenile court's reasonable service finding, arguing that the agency did not provide any supervised in-person visits following the child's detention, and then provided only one supervised in-person visit during the next six months of the dependency. She contends the lack of face to face contact with the child deprived her of the ability to maintain her bond with the child and it is impossible to predict how face to face visits might have motivated mother and the child to work diligently towards repairing their relationship and remedying the "unhealthy communication patterns that had developed in their relationship." We find mother's arguments unavailing.

## I.    Applicable Law and Standard of Review

"At each review hearing, if the child is not returned to the custody of his or her parent, the juvenile court is required to determine whether reasonable services that were designed to aid the parent in overcoming the problems that led to the initial removal and the continued custody of the child have been offered or provided to the

13

parent (reasonable services finding)." (*In re J.P.* (2014) 229 Cal.App.4th 108, 121.) When the court determines to terminate reunification services at a six-month status review, as occurred in this case, the juvenile court may not set a section 366.26 hearing unless it finds, by clear and convincing evidence, that the agency has offered or provided reasonable services to the parent. (§ 366.21, subd. (b)(4).)

Additionally, "[a]ny motion to terminate court-ordered reunification services prior to the 12-month review hearing for a child who is three years of age or older" at the time of removal, as in this case, "shall be made pursuant to section 388, subdivision (c).) [¶] Section 388, subdivision (c) provides that any party . . . may petition the court, prior to the applicable review hearing, to terminate court-ordered reunification services only if one of the following conditions exist: (1) it appears that a change of circumstances or new evidence exists that satisfies a condition set forth in the reunification bypass provisions under section 361.5, subdivision (b) or (e), or (2) the action or inaction of the parent creates a substantial likelihood that reunification will not occur, including, but not limited to, the parent's failure to visit the child, or the failure of the parent to participate regularly and make substantive progress in a court-ordered treatment plan. (§ 388, subd. (c)(1)(A), (B).)" (*In re J.P.*, *supra*, 229 Cal.App.4th at p. 122.) "The court shall terminate reunification services during the above-described time periods only upon a finding by a preponderance of evidence that reasonable services have been offered or provided, and upon a finding of clear and convincing evidence that one of the conditions in subparagraph (A) or (B) of paragraph (1) exists." (§ 388, subd. (c)(3).)

In seeking writ relief, the burden is on mother to show that there is no substantial evidence to support the juvenile court's reasonable services findings. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) And, in reviewing the court's reasonable services finding, we "determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by" the clear and convincing standard of proof. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, fn. omitted.)[3] However, we do not "reweigh the evidence itself," or "insert [our] views regarding the credibility of witnesses" for those of the juvenile court; rather we "view the record in the light most favorable" to that court's order, indulging all "reasonable inferences" that the court may have drawn from the evidence and accepting the court's resolution of conflicting evidence. (*Id*. at p. 1008.)

## II. Analysis

Mother limits her challenge to a contention that the juvenile court's reasonable services finding is not sustainable because the agency did not comply with the court's directive to provide her with supervised in-person visits with the child, except on one occasion, since the child's detention in November 2021. For the reasons we now explain, we see no merit to mother's contention.

---

[3] Concededly, the juvenile court's reasonable services finding is subject to different standards of proof when considering a motion to terminate reunification services under section 388, subdivision (c)(3) (preponderance of the evidence) and when considering termination of reunification services at a six-month status review (clear and convincing evidence) (§ 366.21, subd. (g)(4)). For purposes of our resolution of this writ petition, we will review the court's reasonable services findings under the stricter standard applicable at a six-month status review.

" 'An obvious prerequisite to family reunification is regular visits between the noncustodial parent . . . and the dependent [child] "as frequent[ly] as possible, consistent with the well-being of the [child.]" ' " (*In re S. H.* (2003) 111 Cal.App.4th 310, 317; see § 362.1, subd. (a)(1)(A).) "At the same time, visitation orders must provide for 'flexibility in response to the changing needs of the child and to dynamic family circumstances.' [Citation.] 'In addition, the parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense; the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation.' " (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) While visitation is, without question, an important component of any plan to reunify a family, it is "but a partial component" where "circumstances have placed [the] child at substantial risk of harm and . . . intervention by the juvenile court is deemed necessary to protect the child." (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1375.)

Preliminary, we find no merit to mother's argument that the juvenile court's visitation orders either allowed the child "to totally control the visitation," or granted the agency "complete discretion to determine whether visitation will occur." The court specifically ordered the agency to provide mother with supervised in-person visits for a total of four hours each week.

In ruling that the agency had made reasonable efforts to assist mother in maintaining contact with the child, the juvenile court properly relied on the agency's reports and the social worker's testimony. Mother cites no decisional law that the court was required

16

to seek information from the child's therapist in making its reasonable services finding.  In reviewing the sufficiency of evidence to support a questioned finding, we "must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion.  [Citation.]  There is no corollary to this rule which authorizes [us] . . . to draw inferences from the absence of evidence to overturn the questioned finding."  (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 813.)

Further, the record reflects that the juvenile court specifically addressed mother's contention that the agency had not provided court-ordered in-person visits, except on one occasion during the nine months of the dependency.  The court found that, after an unsuccessful in-person visit in February 2022, the child had made a reasonable request that the agency arrange for the child's continued contact with mother by means of virtual visits and written communications.  The court further found that mother's insistence on only in-person visits – to the exclusion of virtual visits and written communications – was evidence that mother had refused contact with the child.  We see no error in the court's evaluation of the situation: mother had been offered reasonable means to maintain contact with the child but chose not to pursue them.

"While reunification is the preferred outcome when it serves the interest of both parent and child, no interest is well served by compelling inadequate parents to shoulder responsibilities they are unwilling to accept or unable to discharge."  (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1234.)  Absent visitation, mother does not challenge the juvenile court's finding that the agency offered her reasonable

17

reunification services to assist her in reunifying with the child. If mother felt aggrieved by the agency's failure to arrange supervised in-person visits, "she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan." (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416; see *In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046 [where child refuses to comply with valid visitation order, it is parent's burden to seek enforcement or modification in the juvenile court]; *In re Moriah T., supra*, 23 Cal.App.4th at p. 1377 [if the agency is not responsibly "managing the details of visitation, the parent or guardian may bring that matter to the attention of the juvenile court by way of a section 388 petition to modify the visitation order"].) What mother could not do was "wait silently by" until the six-month status review "to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long before that hearing." (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1093.)[4]

## IV. Conclusion

We deny mother's petition for writ relief as she has failed to meet her appellate burden of demonstrating that the juvenile court's reasonable services finding was in error.

### DISPOSITION

The petition for an extraordinary writ is denied on the merits. (Welf. & Inst. Code, § 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452(h).) The request for a temporary stay is denied as moot. Our

---

[4] Contrary to mother's contentions, the cases cited in her petition are factually distinguishable and do not support a different outcome.

18

decision is final in this court immediately.  (Cal. Rules of Court, rules 8.452(i) & 8.490(b).)

_____

Petrou, J.

WE CONCUR:


_____

Fujisaki, Acting P.J.


_____

Rodríguez, J.


A166054/*M.E. v. Superior Court of San Mateo County*