Filed 8/11/25  In re C.N. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.N., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E085050 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ2200163) |
| v. | OPINION |
| I.N., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mona M. Nemat, Judge.

Affirmed.

Emily Uhre, under appointment by the Court of Appeal, for Defendant and

Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie Jarvi, Deputy

County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant, I.N. (father), filed a Welfare and Institutions Code section 388 petition,[1] which the juvenile court denied. Thereafter, the court terminated father's parental rights to C.N. (minor born May 2020). On appeal, father contends the court erred in denying his petition. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On February 21, 2022, officers responded to parents' home regarding an apparent overdose. Parents had arranged for minor to stay at the maternal grandmother's home the previous night. Parents and two friends went out drinking. Father awoke the next morning to find mother's lips blue. Mother and the female friend had both overdosed on Fentanyl.

Officers found a crushed-up Fentanyl pill on the table and marijuana residue in the home. The parents' male friend was a well-known Fentanyl user. Officers confiscated a loaded gun left in a shoebox and 50 pills of Fentanyl found in the male friend's satchel.

Father denied using Fentanyl and did not appear to be under the influence of a controlled substance. Father admitted to using marijuana. He declined to drug test.

During father's interview with law enforcement, father yelled at them loudly, called them vulgar names, threatened them, and eventually assaulted one of the officers. Officers arrested father.

The social worker interviewed father while he was at the police station. Father denied domestic violence between he and mother; however, the social worker confirmed

---

[1] All further statutory references are to the Welfare and Intuitions Code unless otherwise stated.

that police and personnel from plaintiff and respondent, the Riverside County Department of Social Services (the department), had previously come to the home in response to allegations of domestic violence.

Father said he and mother had planned to relocate to Georgia in the next couple of weeks to be closer to his family. He planned on taking minor to Georgia in the coming week.

Father arranged for minor to stay with the maternal grandmother while father was in mourning. However, he was adamant that he did not want the maternal grandmother to provide long-term care for minor.

The maternal grandmother "requested that [minor] remain in her care, stating she has helped care for him since birth. She was on her way to court to try to file for legal guardianship, saying she does not feel it is safe for [minor] to be in the father's care, as he has violent explosive outbursts. She stated he threatened to kill the maternal grandmother and other maternal relatives on February 21, 2022, if they kept his son from him. The father allowed [minor] to be in the maternal grandmother's care only short term."

"The maternal grandmother said she has been actively involved and has been the primary caregiver, as the mother only trusted her with [minor]. The maternal grandmother said the father's family met [minor] when they visited them in Georgia in February 2022, emphasizing that the father's family is not involved. The child does not know the paternal relatives. The maternal grandmother conveyed concern about the father's ability to provide adequate care and supervision, as the mother had been the

3

primary caregiver before her passing. The father did not want the responsibility of being a caregiver/parent previously. The father loves [minor], but he did not want to be a full-time parent, according to the maternal grandmother."

A previous department referral dated December 4, 2021, regarding parents had been substantiated. Officers were called to parents' home in response to a domestic violence incident. Parents were uncooperative with law enforcement. Officers were called back to the home again a half-hour after they left by neighbors who heard screaming inside parents' home.

Mother, who had possibly been thrown out of the residence naked, left on foot. Father was found at the residence with minor. The residence's interior was destroyed: "There was food thrown against the wall, the glass shower door was shattered, and there was glass all over. Law enforcement [were] unable to determine if a crime had occurred. Law enforcement retrieved two firearms from inside the residence[:] one registered to the father and one unregistered rifle. The guns were taken for safekeeping. The father had marijuana lying around the home. The mother was on probation for robbery."

"[P]arents admitted engaging in verbal altercations due to the father sending text messages to other women. This caused a lack of trust from the mother. She contacted the paternal grandfather and paternal great-grandmother. As a result, the father lost control of his anger and shattered the bathroom shower door. The parents' one-year-old son . . . was in a different room during the incident. However, he was at risk as he heard

4

the altercation and the parents' actions, directly and indirectly, placed him at risk of harm/neglect."

On January 4, 2021, law enforcement contacted mother, who was then living separately from father, after father went to the mother's home demanding money, which mother refused to give him. Father kicked down the mother's front door causing minor injuries to her foot. Father then went into the mother's bedroom and grabbed minor, put minor into a car seat, and attempted to drive off; however, law enforcement arrived about the same time and arrested him. The department offered parents preventative services prior to closing the referrals.

On February 23, 2022, the department took minor into protective custody and placed him with the maternal grandmother. On February 25, 2022, the department filed a section 300 juvenile dependency petition alleging that father had been arrested for felony battery on a police officer (b-1), had a history of abusing controlled substances (b-2), suffered from unresolved mental health issues (b-3), and had a history of domestic violence (b-4). On February 28, 2022, the juvenile court detained minor.[2]

In the jurisdiction and disposition report filed March 16, 2022, the social worker recommended that the court find the allegations in the petition true, remove minor from father's custody, and grant father reunification services. The social worker opined father "would benefit from parenting education, anger management, substance abuse services, domestic violence, and individual counseling."

---

[2] At the department and minor's counsels' requests, father agreed to drug test prior to being granted visitation with minor; the court ordered the testing.

5

Father had relocated to Georgia on March 5, 2022, to be closer to family.[3] Father described minor as "his best friend." He said minor was a happy baby and enjoyed "doing boy things." Father had a supervised virtual visit on March 10, 2022. He would continue to "have ongoing virtual visits supervised by the maternal grandmother Mondays and Thursdays." The social worker explained to father that there was a statutory time frame of six months for reunification services due to minor being under the age of three.

At a hearing on March 21, 2022, father's counsel stated, "Father did drug test prior to leaving for Georgia. Those results were not included in the latest report, so I ask that those be made available for the next hearing." The court ordered the department "to include an addendum with any drug test results that may be available for the next hearing."

On April 22, 2022, at the contested jurisdictional hearing, father's counsel disputed the allegations and requested family maintenance services. Otherwise, father's counsel requested liberalized visits: "I would ask that [visits] be liberalized to include unsupervised, weekends, overnights, and eventually move into family maintenance, Your Honor. I understand he's in Georgia, but he will be planning to come visit his son as soon as possible and as soon as those visits become available for him." Father's counsel noted that "father drug tested before leaving for Georgia on or about February 28th,

_____

[3] It does not appear the People ever filed formal charges against father for the battery.

2022[.]" "It seems the Department is having some difficulty securing the results. I just ask . . . for continued efforts on the Department to get those results."

The court found the allegations in the petition true, sustained the petition, adjudged minor a dependent of the court, removed minor from father's custody, and granted father reunification services. The court ordered, "The next report should include any drug test results for father, and certainly the one that [father's counsel] has indicated that father submitted to on February 28th, 2022."

In the September 29, 2022, status review report, the social worker recommended the court continue reunification services for father and authorize an Interstate Compact for the Placement of Children (ICPC) on behalf of father in the state of Georgia. The department had previously submitted an ICPC on behalf of father, which was denied because defendant had not completed 75 percent of his case plan. Father had several active warrants issued due to unresolved vehicle infractions.

The previous social worker had provided father "with general counseling, domestic violence, parenting education, and substance abuse treatment service referrals in the State of Georgia." That social worker made three attempts to contact father between May 18, and July 28, 2022. Father had apparently changed his phone number and provided the new number to the previous social worker on August 3, 2022.

The new social worker had reached out to the Department of Children and Family Services (DeKalb) located in DeKalb County to request community resources for the father in regard to his general counseling, domestic violence, parenting education,

substance abuse treatment, and substance abuse testing."**4** She "was informed [father] would need to come into to his local [DeKalb] office . . . and request a . . . '[p]acket,' which was reported to have the general counseling, domestic violence, parenting education, and substance abuse treatment services." DeKalb would not provide information regarding the resources to the social worker personally because she was not a social worker in the State of Georgia.

The social worker contacted father with the information she had received from DeKalb. She also requested that he send her information on the drug testing site of his choice. Father reported he was attending general counseling and receiving psychiatric care. He reported he had enrolled in services at the end of August 2022, and had already completed eight sessions. Father said he attended therapy once or twice a week and sees a psychiatrist once a month. The social worker attempted to verify the information, but she had yet to receive a response from either father's therapist or psychiatrist.

Father reported he was scheduled to begin a 24-week anger management and domestic violence class program; his intake appointment had been set for October 3, 2022, and classes were set to begin on October 13, 2022. The social worker verified father's enrollment and the program dates.

---

**4** The social worker acknowledged that the court had previously ordered the department to include an update on father's drug test results. However, no results for any previous test appear in this or any subsequent report.

Father reported he had a scheduled an intake appointment for substance abuse treatment for September 29, 2022, which the social worker confirmed. Father reported that he had not used marijuana "in the past few months."

Father had virtual visitation with minor every Monday and Thursday for at least one hour. The maternal grandmother reported father was a "no show" for visits on May 13, June 23, July 4, 11, 18, and 25, 2022. Father missed a visit due to illness on July 27, 2022.

In an addendum report, the social worker confirmed father's enrollment in parenting education services. The maternal grandmother informed the social worker that if reunification failed, she was willing to adopt minor.

At the six month review hearing on October 24, 2022, the court granted father six additional months of services.

In the June 1, 2023, 12-month status review report, the social worker recommended additional reunification services for father. The social worker could not confirm father's participation in his anger management and domestic violence class, therapy, and parenting class because father had yet to sign a release. The social worker requested father complete the release, which he stated he would, but he had yet to do so. Father told the social worker he had not participated in any substance abuse program: "" I . . . just stopped smoking all in total.'"

The maternal grandmother reported that father had been inconsistent with visitation. Father visited with minor on November 25, once in December 2022, on

9

February 11, and April 2023; the latter visit lasted for 20 minutes. Father failed to visit with minor in October 2022, January, or March 2023.

Father reported "that he frequently visits [minor], he stated [father] flies out to see [minor]. The last visit was in April 2023; [father] expressed that at the beginning there was an adjustment period. [Father] reported that [minor] is happy to see him and [minor] gets sad when he leaves."

At the hearing on June 13, 2023, the court filed father's certificate of completion of a parenting program. Father's counsel noted that father informed him "that he's engaged with all of his other case plan. He turned in a release of information." "He's going to be starting substance abuse shortly. He's been engaged with counseling. He continues be to be engaged in domestic violence and has a plan to complete in a few months. He did finish the parenting." "He just wanted me to state he was in substance abuse treatment. He was progressing well; however, he was dropped because he went to a visitation in California and missed two sessions and was dropped because of that, so he had to restart, which he will be soon."

The court noted that "visitation has been very sporadic. I understand father is out of state, but it looks like even when he is here, his visitation is very limited."

Father's counsel reported that father "states that he has phone or FaceTime contact with [minor] on average about two times a week, anywhere from 30 minutes to an hour and a half. And he has been doing that steady for the last year. This most recent visit was on his birthday; it was [May] of this year. He visited for three days for hours. One

10

of the visits [was] two-and-a-half hours; another visit was for four hours on his actual birthday." "In April, he had one visit that was a longer visit. It was above six hours."

"In February, he had two visits for two hours on the 11th and 12th. And then on the 6th another two-hour visit. October there were no visits in person, but he's had steady phone FaceTime. In November, he had two visits, one for four hours and one for an hour and a half. In December was one visit for an hour. And then in January no visits in person, but he's having a steady FaceTime or phone all the while."

The court reset the matter for a contested hearing. It directed the department to confirm visitation with the maternal grandmother. The court ordered father to complete a hair follicle drug test.

In the August 24, 2023, 18-month status review report, the social worker recommended the court terminate father's reunification services and set the section 366.26 hearing. Father had enrolled in domestic violence services in October 2022; however, in November 2022, father was disqualified due to excessive absences. Father reenrolled on April 10, 2023; he had completed 12 out of 24 classes.

Father had not been consistently attending counseling sessions. His last verified session occurred on March 2, 2023. The social worker was still having problems receiving confirmation of services because father had yet to file a release. On August 17, 2023, the social worker again requested father sign a release.

With respect to substance abuse treatment, on May 24, 2023, father again told the social worker that he had not attended substance abuse classes, but he had stopped using.

11

On July 28, 2023, father told the social worker he had last used marijuana two to three weeks earlier and was looking for a program in which to enroll. The social worker provided father program information and later attempted to confirm his enrollment. All attempted contacts with him went unanswered. Father had yet to confirm enrollment in a substance abuse treatment program.

The social worker on July 27, 2023, consulted with a "drug test liaison worker in order to send [*sic*] hair follicle test in [*sic*] Georgia." The social worker was still waiting to hear back.

The maternal grandmother again reported that father failed to show or call for visits scheduled on May 13, June 23, July 4, 11, 18, and 25, 2022. On August 8, 2022, and August 11, 2022, [father] had in-person visit[s] with [minor], which [were] supervised by the caregiver. The caregiver denied having any concerns regarding the in-person visits between [father] and the [minor]. She maintained visitation went well and reported [minor] was comfortable with his-father."

"Father [] stated that he frequently visits [minor]. He stated [father] flies out to see [minor]. The last visit was in April 2023; [father] expressed that at the beginning there was an adjustment period. [Father] reported that [minor] is happy to see him and [minor] gets sad when he leaves."

The maternal grandmother again reported that father was inconsistent with visitation. She reported that father did not visit with minor in October 2022, January, or March 2023. The maternal grandmother stated father had one, one-hour visit with minor

12

in November 2022; one, two-hour visit in December 2023; one, one-hour visit in February 2023; and two, 20-minute visits in April 2023, when father was in California for more than a week.

On August 10, 2023, the maternal grandmother again stated father was inconsistent with both his in-person and virtual visits. The last in-person visits between them occurred for two hours on July 3, 2023, and for 20 minutes on July 24, 2023. She reported that father sometimes visited minor with his friends. She said she sometimes smelled marijuana; father would smoke marijuana outside the maternal grandmother's home when he came to visit.

In an addendum report filed November 9, 2023, the social worker reported she had received a release of information from DeKalb with father's signature on October 18, 2023. Father's therapist reported that father had been participating in telemedicine therapy sessions every few weeks since April 9, 2022. The social worker was unable to obtain father's progress report.

The social worker received an email regarding father's progress in a domestic violence class. The report indicated father's performance was satisfactory in every category. Father had attended 10 classes, was late one day, and had one absence between August 7, 2023, to November 7, 2023.

On October 31, 2023, the social worker received confirmation that father had been admitted to a substance abuse treatment program on September 5, 2023: "The program included eight weeks of treatment and [father] began to gradually show improvement by

13

meeting his treatment goals. [Father] was compliant, cooperative, and active during treatment and completed [the program] on October 31, 2023."

On October 3, 2023, the social worker received confirmation that father had failed to show for a hair follicle test she had submitted on his behalf. On October 25, 2023, the social worker submitted another referral; father tested positive for Cannabinoid.

On October 17, 2023, father visited minor for 20 minutes. Father said he would visit minor on October 18, 2023, but he failed to show. On October 19, 2023, father had an in-person visit with minor at a park. Minor "appeared to be happy to see [father] as evidenced by running to him and showing the pumpkin he brought from home. [Father] was providing adequate supervision to [minor] while they are playing at the playground." The visit continued at the maternal grandmother's home and lasted for a total of four hours. Father's last in-person visit with minor occurred on October 22, 2023, for approximately six hours.

At the 18-month review hearing on November 15, 2023, the social worker testified father was provided a case plan which included "parenting education, individual counseling, substance abuse program, and substance abuse testing." Father had completed the parenting and substance abuse treatment components of his plan. Father had not completed the therapy, domestic violence, or testing components. The social worker was also concerned about father's continued marijuana use.

Father testified the department did not provide him with referrals to any services. He was given one referral for a hair follicle drug test, but the entity to which he was

14

referred was closed. Father had completed his reunification services. He had drug tested negatively four times. Father never tested positive for anything other than THC. He had been regularly visiting with minor. The maternal grandmother did not want him to get minor back. She incorrectly reported that he had no showed to visits or had shortened visits. Father had never failed to show for a visit.

Minor screams father's name when he sees him. He then pulls father "into the house, starts showing [him] all his toys and whatever else new he has, cloth[e]s, anything around the house that he would like to show me. Then he sets [father] down in his area to start playing with his toys."

Father would never use marijuana before or during visits with minor. When he tested positive for marijuana, "What they had told me is that I'm a bigger person, so I think my test results said I was 30 and the cutoff level was 20. So they just said it took a little longer for it to get out of my system. But throughout that whole time, I did not use marijuana." The last time he used was three and a half months earlier.

The department noted they were already three months past 18 months of services. Minor's counsel noted, "Generally speaking, this should be a six-month case. We have gone out past 18 months on this case. 18 months expired in August."

The court found the department had failed to provide reasonable services. The court granted father additional reunification services and scheduled the 24-month hearing. The court ordered father to submit to a hair follicle drug test before he left for Georgia.

The January 30, 2024, addendum report, reflected that father had drug tested negative for all illicit substances on November 16, 2023. On January 16, 2024, the social worker submitted a referral for father to drug test in Georgia; father failed to show for testing.

Father reported that the domestic violence class he was scheduled to complete had been shut down. He reported he had enrolled in another program; however, the social worker had not received any confirmation. Father had been attending individual therapy regularly, on a monthly basis.

Father came to visit minor at the maternal grandmother's home on November 22, 2023. Father continued to have regular virtual visitation. The social worker asked minor if he liked talking to father on the phone; minor responded that he did not. The social worker had submitted an ICPC referral on behalf of father on November 21, 2023; she was still awaiting its completion.

In an addendum report filed February 16, 2024, the social worker recommended the court terminate reunification services and set the section 366.26 hearing. On January 30, 2024, father failed to show for a random drug test. Father reported completing his domestic violence program. Father drug tested on February 2, 2024; the department had yet to receive the results. Father failed to show for virtual visits scheduled on February 1, 5, 8, and 12, 2024.

In an addendum report filed March 5, 2024, the social worker reported that she had inquired about the status of the ICPC assessment twice since the last report, but she

had not received a response. Father supplied the social worker with the results of a hair follicle drug test he submitted on February 13, 2024; the results were negative; however, the collection facility was not the one to which the department had submitted the referral; the social worker indicated it was not clear whether the laboratory used an approved test.

Father reported he had visited with minor on February 7, 12, and 14, 2024. Father refused visitation monitored by the department. The maternal grandmother reported that father failed to show for visitation on February 15, 19, 22, and 26, 2024. The maternal grandmother reported that visitation on February 29, 2024, lasted 17 minutes: "They just said hi to each other. Then [father] was eating dinner and [minor] started playing with his toy. The [maternal grandmother] stated there [was] not much conversation during the visitation."

A criminal records search reflected that father was convicted of obstruction of a police officer (§ 148, subd. (a)(1)) on January 4, 2021. A court issued a bench warrant for father's arrest on April 12, 2022.

The social worker noted: "Although [father] completed a substance abuse treatment program, the program recommended that [father] continue to obtain therapeutic support upon discharging from the program. [Father] reported he is not attending [an] aftercare program []or NA meetings and has not provide[d] the Department of his plans to maintain his sobriety." Father had still failed to verify completion of his domestic violence program.

At the 24-month hearing on March 8, 2024, father testified he had missed two drug tests. He had missed visits with minor.

Father failed to complete his domestic violence program because it closed. The social worker failed to find him a new program; he was unable to find any in-person programs on his own. All the in-person programs required a referral, which the social worker would not give him. Eventually he completed an online domestic violence program, which he believed involved 120 hours of work. He refused department monitoring of visitation.

Father twice tested negative by hair follicle test. None of his tests had come back positive. He had completed a domestic violence program, for which he had provided a certificate of completion to his attorney.

The social worker testified she gave father a new referral for a domestic violence class once he informed her his original program closed. She never received a certificate of completion from father despite asking. Father told her his online course included 24, one-hour sessions.

The court terminated father's reunification services and set the section 366.26 hearing. The court found that father had failed to prove he had completed a domestic violence program, failed to provide proof of completion of counseling, had failed to drug test consistently, and failed to visit minor consistently. The court authorized a bonding study.

18

In the section 366.26 reports filed July 16, 2024, the social worker recommended the court find adoption as the most appropriate plan and terminate father's parental rights. Father reported that he was scheduled to have an intake session for individual counseling, had attended a 16 hour domestic violence class, and attended a substance abuse program. The social worker was unable to confirm father's completion of the domestic violence course. Father still had a bench warrant for his arrest. Virtual visitation had occurred on April 22, and June 27, 2024.

The social worker noted that the department had placed minor with the maternal grandmother, the prospective adoptive parent, on February 23, 2022. Minor was "making lifelong connections with relatives as his cousins visit the maternal grandmother's home weekly, which the caregiver reported [minor] looks forward to."

"The prospective adoptive mother expressed her priority is caring for [minor] and his well-being." "[S]he reported she and her sister did live together in the same house with all of their children." "The prospective adoptive mother is motivated to adopt [minor]. She expressed [minor] was her daughter['s] son and she loves him. She stated she wished to give him a better life and provide him a permanent home." "She reported she has had a relationship with him since he was born. She stated her daughter and [minor] were often at her home and she would keep him on and off for days at a time. She reported the day her daughter passed away, [minor] was with her. She reported [minor] calls her mom. She shared she has explained to [minor] that he has two moms,

19

her and her daughter who passed. She stated they have a strong attachment and love each other."

On September 3, 2024, father filed a section 388 petition requesting the court transfer the case to Georgia to let social services there complete the case, terminate jurisdiction and return minor to father's care, or give father enhancement services and finish the ICPC so that services could be completed in Georgia. Father contended he had completed his case plan,[5] had consistently tested negative for illicit substances,[6] and had a bond with minor such that the requested changes were in minor's best interest. The court ordered a hearing on the petition.

On September 20, 2024, father filed the bonding study, in which the psychologist concluded, "While the bond between minor and father is positive, there was no data that would suggest current placement arrangements be altered." The psychologist conducted the bonding study over one hour in his office: "Father brought several new toys for the minor. Father sat on the couch leaning back most of the time." "Minor sat on a stool facing the couch and played with his toys. Sometimes father would interact with the minor, other times he just leaned back and talked with the evaluator . . . ." Father and minor hugged at the end of the visit.

---

[5] Father attached certificates of completion of domestic violence classes dated January 27, and June 21, 2024.

[6] Father attached negative test results dated March 22, April 18, May 30, June 17, July 15, 2024.

A social worker observed a video visit between father and minor on August 29, 2024. She stated their interaction was limited as minor was occupied by the toys in the visitation rooms.

At the hearing on November 15, 2024, father testified he had finished his domestic violence, therapy, and parenting classes and had drug tested negative going back a year. Minor was like father's best friend: "Even with what's going on now, when we get together and stuff like that, we could always laugh, make jokes. And one of our favorite things to do is play basketball, play catch. He loves showing me a lot of toys. He loves his Ninja Turtle toys. Last time I [saw] him, I got a Ninja Turtle set where you could mismatch the bodies and stuff like that. We played with that. Yeah, [minor] is definitely my best friend." Minor called father "Daddy, dad." Minor tells father he loves him.

It was in minor's best interest to be placed with father, "Because I'm his father, his dad. I have a support system to help raise him. Yeah, I mean, he already lost his mother. And I don't really see why he [sh]ould lose two parents." Georgia approved father for an ICPC after the court terminated his reunification services.

Since the court terminated father's reunification services, he visited with minor once monthly. Some of those visits were in person. Father missed one visit due to a switch in social workers.

The psychologist testified that he conducted a bonding study of father and minor: "I did find there was a positive bond between father and the minor." "[M]y finding was that while [the] bond between minor and father is positive, there was no data that would

21

suggest current placement arrangements be altered.  There was no data that would suggest [the] current visiting schedule be altered . . . ."  "I think [minor] would benefit from continuing a relationship with his father."

The court found that father had shown a change in circumstances.  However, the court noted minor had been with the maternal grandmother for two-and-a-half years: "A four-and-a-half year old who has been with the same caretaker for two-and-a-half years, to move him and to remove him from that home to a different state with a whole different set of people is not in his best interest."

The court stated that it did not have the ability to grant father additional services: "By statute, he was given 24 months['] worth of services, which is the maximum that he can be given."  The court denied father's section 388 petition "based on the best interest because the Court finds it is not in the best interest of the child."

The court then found the parental bond exception to termination of parental rights inapplicable, found minor adoptable, and terminated father's parental rights.

## II.  DISCUSSION

Father contends the court erred in denying his section 388 petition.  Specifically, father maintains the court erred in finding that it lacked legal authority to provide additional services.  We disagree.

"Section 388 provides for modification of juvenile court orders when the moving party (1) presents new evidence or a change of circumstance and (2) demonstrates modification of the previous order is in the child's best interest.  [Citations.]  '"The

22

petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child."'" (*In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194.)

"When, as in this case, a section 388 petition is filed after family reunification services have been terminated, the juvenile court's overriding concern is the child's best interests. [Citation.] The parent's interests in the care, custody and companionship of the child are no longer paramount; and the focus shifts to the needs of the child for permanency and stability. [Citations.] Nonetheless, a parent may rebut the presumption that continued care is in the best interest of the child after termination of reunification services by showing that circumstances have changed and would warrant further reunification services. [Citation.]" (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1122-1123 (*Malick*).)

"We review the court's best interest determination, the second step, for abuse of discretion and may disturb the exercise of that discretion only in the rare case when the court has made an arbitrary or irrational determination. [Citations.] We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the juvenile court. [Citation.] We ask only whether the juvenile court abused its discretion with respect to the order it made. [Citation.]" (*In re Matthew M.*, *supra*, 88 Cal.App.5th at pp. 1194-1195.) "The denial of

a section 388 motion rarely merits reversal as an abuse of discretion." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.)

"However, when the court's denial is based on a mistake of law, our review is de novo." (*Malick*, *supra*, 73 Cal.App.5th at p. 1123.) The juvenile court errs when it concludes "that, prior to a properly noticed section 366.26 hearing at which [the parents'] parental rights are terminated, additional reunification services, even if warranted, could not be ordered to assist [the parents] in attempting to regain custody of [their] . . . children." (*Id.* at p. 1126.)

"The harmless error doctrine applies in dependency cases. [Citations.] . . . . '"Reversal is justified 'only when the court, "after an examination of the entire case, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the [petitioning] party would have been reached in the absence of the error.'"' [Citation.]" (*Malick*, *supra*, 73 Cal.App.5th at p. 1128; see *In re J.P.* (2014) 229 Cal.App.4th 108, 128-129 [harmless where juvenile court erroneously failed to hold a hearing on a § 388 petition]; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1162.)

Here, citing *Malick*, father maintains that the court erred as a matter of law in denying his section 388 petition based on its understanding that it could not legally grant father additional *reunification* services. The court stated that it did not have the ability to grant father additional services: "By statute, he was given 24 months['] worth of services, which is the maximum that he can be given."

As the department notes, father did not request additional *reunification* services. Rather, he requested *enhancement* services.

Enhancement services are "'child welfare services offered to the parent not retaining custody, designed to enhance the child's relationship with that parent.' [Citations.]" (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 212; accord, *In re A.C.* (2008) 169 Cal.App.4th 636, 642, fn. 5 ["'enhancement' services are 'not designed to reunify the child with that parent'"]; accord, *In re C.S.* (2022) 80 Cal.App.5th 631, 636-637.)

Thus, by requesting *enhancement* services, the court was not required to consider granting father *reunification* services "even if warranted, . . . to assist [father] in attempting to regain custody of [his] . . . child[]." (*Malick*, *supra*, 73 Cal.App.5th at p. 1126.) This is because "'enhancement' services are 'not designed to reunify the child with that parent.'" (*In re A.C.*, *supra*, 169 Cal.App.4th at p. 642, fn. 5.)

Moreover, the court properly denied the petition based on its finding that the requested services would not be in minor's best interest. Finally, even if the court erred as a matter of law in determining it could not award father additional services, reunification or enhancement, any error was harmless.

Here, the maternal grandmother was already considerably involved in minor's life prior to the department's intervention. Minor was only just over one and one-half years old when the department intervened. The maternal grandmother had been one of his primary caregivers. Parents had arranged for her to take care of minor the night of the

25

incident. The department placed minor with the maternal grandmother on February 23, 2022.

Just over a week after the department filed the juvenile dependency petition, father moved to Georgia. We are not unsympathetic to the fact that father was in mourning and that by moving closer to family, father would have company to ease him through that process; however, there is no question that by moving to the other side of the country, father would have a much more difficult time maintaining a relationship with minor; this is especially true due to minor's young age and the difficulty of having in-person visitation.

Father then continuously failed to show for the limited visitation he could have since moving to Georgia, sometimes going whole months without visitation. Visitation often lasted only around 20 minutes.

Minor indicated at least twice that he did not like speaking to father on the phone. There was evidence that some visitation between father and minor involved little interaction. There was evidence that father had been using marijuana immediately prior to and even during visitation. Father never proceeded to unsupervised visitation.

During the reunification period, father had over 24 months of services in a case in which services ideally would have been limited to only six months (§ 361.5, subd. (a)(3)(C)); father still failed to successfully reunite with minor.

Although the psychologist found that minor and father had a bond, he found that there was no data to suggest the current visiting schedule or placement should be changed.  Minor did not know his relatives in Georgia.

Minor was "making lifelong connections with relatives as his cousins visit the maternal grandmother's home weekly, which the caregiver reported [minor] looks forward to."  At the time of the hearing on father's petition, minor had been in the maternal grandmother's care for well over two-and-one-half years.  She and minor had a strong bond.  The maternal grandmother was dedicated to adopting minor and providing for his well-being.  Minor called her "mom."  Thus, the juvenile court acted within its discretion in denying the petition based on minor's best interest in acquiring stability and permanency in an adoptive home with the maternal grandmother.

### III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

CODRINGTON
J.

RAPHAEL
J.